Carolyn J. VINSON, Appellee,

v.

LINN–MAR COMMUNITY SCHOOL DISTRICT, David J. DeWalle and Jerry Williams, Appellants.

No. 83–953.

Supreme Court of Iowa.

Dec. 19, 1984.

Rehearing Denied Jan. 10, 1985.

Stephen J. Holtman and Gregory M. Lederer of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, and Martha L. Quint of Faches, Gloe & Quint, Cedar Rapids, for appellants.

Tom Riley, Hugh G. Albrecht and Mary K. Hoefer, Cedar Rapids, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McCORMICK, CARTER, and WOLLE, JJ.

McCORMICK, Justice.

This case demonstrates how mountains can be built from molehills. A dispute between a school bus driver and school district officials about what entry the driver should make on time cards to receive predetermined compensation escalated into an action by the driver against the officials and district for defamation, intentional infliction of emotional distress and wrongful discharge, resulting in judgment for the driver on jury verdicts totalling $226,-132.40. Upon defendants' appeal, we affirm in part and reverse in part.

The determinative questions involve the applicability of Iowa Rule of Civil Procedure 215.1, submission of the three theories of action, various damages issues, evidentiary rulings, and conduct of plaintiff's counsel. We recite the evidence in the light most favorable to the verdict.

Plaintiff Carolyn J. Vinson was employed as a school bus driver by defendant Linn-Mar Community School District. Her immediate supervisor was defendant Jerry Williams, the district's director of transportation. Defendant David J. DeWalle was the district's business administrator, school

board secretary and Williams' immediate superior.

Pursuant to the terms of a master employment contract, plaintiff was paid in accordance with the designated route time for the route she drove. The route time was not the actual driving time on a particular occasion but the amount of time determined by Williams to represent a reasonable time within which the route ordinarily could be completed. Extra pay was available in appropriate cases for delays caused by breakdown.

Plaintiff drove the same route during the 1979–80 and 1980–81 school years. In the afternoon she left the bus barn at 2:45 p.m., drove to Williams Elementary, picked up the students, delivered them to their homes, and then returned to the bus barn. During the 1979–80 school year her pay was based on route time of one and one-half hours. It was increased by one quarter hour for a period during the winter to allow for delays caused by bad weather. In filling out her time cards, plaintiff showed her starting time as 2:45 p.m. and recorded her return time as the time shown on the office clock after her return to the bus barn, rounding the time off to the nearest five minutes. The time shown on the cards did not affect her compensation, however, because her compensation was based on the time allotted for the route. Other drivers recorded their time in the same way.

In the morning of October 21, 1980, plaintiff raised an issue with Williams about breakdown pay. She also questioned whether a fellow employee was entitled to seniority over her because she thought the employee had quit for a time during her period of employment. She suggested that another driver with less seniority than she had was being given extra runs that she was being denied. She continued the discussion with Williams' just before starting her afternoon route. When she returned from the afternoon route, Williams' secretary informed her that she was being overpaid because her route had a starting time of 2:50 p.m. instead of 2:45 p.m. All of the

other drivers started at 2:45 p.m., and no one had previously told her she had a different starting time. Williams was present and, upon plaintiff's inquiry, he verified that she was not to start until 2:50 p.m. This upset her, she says, because she was concerned about the safety of the children waiting for her outside the school. That evening she called DeWalle to express her concern, and the next morning she called in to report she was ill and could not drive the morning route. She came to work in the afternoon.

Commencing with the afternoon of October 22, 1980, and ending in November, Williams conducted a time study of plaintiff's afternoon route. He timed plaintiff's actual driving time and did not include the time consumed by plaintiff's additional duties in shutting the bus down after her return from the route. He determined that the route could be driven within one hour and fifteen minutes. DeWalle directed that plaintiff's compensation be adjusted accordingly to pay her for a route time of one and one-quarter hours. This had the effect of reducing plaintiff's pay from $8.30 to $8.05 for driving the afternoon route. DeWalle told Williams that the change should be reflected on plaintiff's time card.

The district's payroll system required employees to make entries on time cards even though pay was based on designated route time rather than actual driving time. After completing his time study and reducing plaintiff's pay for the afternoon route, Williams told her for the first time to fill out her time cards to show her starting time as 2:50 p.m. and her return time as 4:05 p.m. each date, regardless of actual driving time. Plaintiff did not record the return time in the manner directed. Instead she wrote the time shown on the office clock after she completed each day's route. That is, she recorded her actual check-out time rather than the designated return time. She continued the same practice for her morning route, and no complaint was ever made to her about that. Her compensation was unaffected because

she continued to be paid in accordance with the reduced route time.

On December 1, 1980, Williams orally requested that plaintiff change her time cards for the prior two weeks to show a 4:05 p.m. return time. She refused to do so. After consulting with DeWalle, Williams issued her a written memorandum prepared by DeWalle on the subject of "Falsifying Time Cards." The memorandum provided:

> During our discussion this morning, I requested that you change the time you had recorded on your time cards dated Nov. 21, 1980 and Nov. 28, 1980 to reflect the correct time required to drive route #36 in the afternoon, which is 1 hour and 15 minutes. Since you have elected not to record the correct time on your time cards, I will forward your cards to the payroll department without my required approval but with my instructions that you be paid the 1 hour and 15 minute rate.
>
> Further, since you have elected not to change the time you incorrectly recorded, after it was clearly pointed out that the route time does not exceed 1 hour and 15 minutes, I am issuing this memo to you as a written warning for falsifying information on time cards.
>
> This is a very serious matter and any further action of this type will result in suspension. Further action, if needed after suspension, will be in the form of termination of employment.

When plaintiff persisted in recording the actual check-out time on the cards, Williams suspended her, utilizing a written memorandum entitled "Suspension for falsifying time cards":

> This is to inform you that you are suspended from work for knowingly falsifying information recorddd [sic] on your time card for the week of December 1, 1980.
>
> This suspension will be for 3 days, commencing December 8, 1980 through December 10, 1980, with work privileges [sic] restored on December 11, 1980. Further action of this nature will result

in termination of your employment with the Linn-Mar Community School District.

On December 6, 1980, plaintiff responded as follows by written memorandum to Williams:

> I have reflected on this matter, and letter and have decided the charges stated in the letter are too damaging to go unanswered or unchallenged.
>
> Item 1. Your request that I change the time on my card to read 4:05 to conform to the time Linn-Mar wants to pay would in fact be falsifying my card if I did so. If the transportation department intends to pay a flat rate for each run this should be made clear to employees at the outset and then of course time cards would not be needed and if time is to be a factor then time clocks should be in use.
>
> Item 2. Your statement that I elected not to record the correct time on my time card is inconsistent with the facts. The fact being I recorded the time actually taken to drive route #36 on the days in question.
>
> Item 3. Your statement that my refusal to change the time after it was clearly pointed out that route #36 takes 1 hour and 15 minutes is similar to saying the sun rises at 5:36 every morning. Conditions of all kinds cause the time to vary and one can estimate the approximate time this or any other run will take but one doesn't slam the door and take off and leave little Johnny who is picking up his books just because the time is right. I am finding it very difficult to stay within your time restrictions and still maintain the margin of safety required of any driver. Just as I am finding it difficult on the morning run to stay within the one hour allotted time. Conditions are frequently causing me to run over one hour.
>
> I will not falsify my time card just to keep your books in order further I cannot understand what your complaint is since you are not paying the 1 hour and 15 minutes rate for the morning and 1 hour and 30 minute rate for the afternoon run even though you did pay those

rates last year, as payroll records would surely confirm.

Item 4. We are in agreement on the seriousness of this matter, therefore I do not want this charge of falsifying information in my file and cannot allow it to go unchallenged. If this matter cannot be resolved at this level, I shall require information and addresses of the appropriate body or persons to review my complaint.

When plaintiff returned to work after her suspension, she continued to record actual check-out times. Upon inquiry by Williams she said she would continue to do so. After consulting with DeWalle, Williams then fired her through a memorandum dated December 12, 1980:

Effective November 17, 1980, the authorized time for the afternoon portion of route # 36 was set a [sic] 1 hour and 15 minutes because of a discrepancy that existed between route pay and actual driving time. Information was given to you on November 17, 1980, relative to the authorized time for the afternoon run of route # 36 and you were requested to begin completing your time cards to reflect the authorized time established for the route.

You elected to disregard the request and consistently entered times on your time cards (weeks of November 21 and November 28) of more than the time authorized for the afternoon portion of route # 36. You were then asked to change the time on your time cards for those weeks to reflect the actual route time of # 36 but you refused and this led to a written warning on December 2, 1980. It was spelled out for you at this time that further incorrect recordings of time on your time card would lead to a more harsh form of discipline.

You again disregarded the authorized route time for # 36 and entered times on your time card that consistently exceeded the authorized time during the week of December 1, 1980. After discussion of this situation with you and representatives of the Driver Association, you were

suspended from work for 3 work days commencing on December 8, 1980.

Your letter of December 6, 1980, expressing your views was received and will be placed in your file.

During the time you were suspended, a substitute driver drove route # 36 in the afternoon and did so for 3 afternoons in less than 1 hour and 15 minutes each time. For Thursday and Friday of this week, you drove route # 36 and once again recorded times on your time card that exceeded the authorized time of 1 hour and 15 minutes.

The District has been very deliberate with you in making clear what is expected of you throughout this entire matter. It is indeed unfortunate that you have continuously elected to disregard the directions you have been given regarding the proper recording of time on your time cards and you leave no choice for the District.

Therefore, your employment with Linn-Mar Community School District is terminated effective immediately.

Subsequently defendants instructed drivers merely to show their route numbers on their time cards as a basis for receiving compensation at the predetermined rate.

Evidence was received from which the jury could find the events culminating with her firing upset plaintiff and damaged her health. She was hospitalized on three occasions and treated for various maladies including irritable bowel disease. One of her doctors testified that her health problems were caused by stress brought on by the accusation of falsifying records and subsequent firing.

In 1981 plaintiff applied for a bus driving job with the Marion school district. When a Marion official called Williams to inquire why she had been discharged, Williams told him he terminated her "for recording the incorrect time on time cards."

The case was submitted to the jury on special verdicts. Plaintiff was awarded $59,500 as compensatory damages and $31,000 as punitive damages on her defamation claim, $75,000 as compensatory

damages and $59,000 in punitive damages on her claim for intentional infliction of emotional distress, and $1,632 as compensatory damages for breach of contract. Defendants filed posttrial motions which were overruled, and this appeal followed.

■ I. *The Iowa Rule of Civil Procedure 215.1 issue.* Because plaintiff's action was commenced in March 1981, Iowa Rule of Civil Procedure 215.1 required that it be tried prior to January 1, 1983, or be subject to dismissal. Trial had been scheduled for July 19, 1982, but upon plaintiff's motion, unrelated to rule 215.1, the case was continued for trial to January 31, 1983. Subsequently, before August 15, 1982, the clerk notified the parties pursuant to rule 215.1 that the case was subject to dismissal if not tried before January 1, 1983. Upon joint application of the parties, the court entered an order removing the case from the operation of rule 215.1 and continuing the case for trial in 1983.

The court's order did not continue the case to a date certain. Defendants contend this omission made the order continuing the case void so that the case was dismissed by operation of law when not tried before the end of 1982. They rely on our cases applying rule 215.1 to uphold dismissals despite the harsh result when a party has not obtained a continuance in accordance with the rule. *See, e.g., Brown v. Iowa District Court for Polk County,* 272 N.W.2d 457 (Iowa 1978). They assert that an order that fails to continue the case to a date certain is ineffective.

In material part, rule 215.1 provides that grounds for continuance must "be shown by application and ruling thereon after notice and not ex parte." No continuance can be "by stipulation of parties alone but must be by order of court." And, of importance here: "Where appropriate the order of continuance shall be to a date certain." In the present situation the case already had a 1983 trial date. Therefore no necessity existed to specify a date certain in the rule 215.1 order. When the two continuance orders are read together, their effect was to continue the case for trial on January 31,

1983. Thus it was not necessarily appropriate for the rule 215.1 order to repeat the trial date, and substantial compliance with the rule was achieved.

We reject defendants' contention that the case was dismissed automatically under rule 215.1.

II. *Submission of the defamation claim.* Defendants raise a wide range of issues in making a shotgun attack on submission of plaintiff's defamation claim. Although they characterize the issue as an attack on the sufficiency of evidence to support submission, they do not limit their argument to the sufficiency of the evidence. They contend the trial court erred in instructing that Williams made statements that were libelous per se and slanderous per se, in failing to dismiss the case on the ground of qualified privilege, and in failing to require plaintiff to prove negligence as one element of defamation.

A. *Libel and slander per se.* Plaintiff's libel claim was based on the Williams' memoranda accusing her of falsifying information on her time cards. The term "falsifying information" was used in the first two memoranda but not in the third. Plaintiff's slander claim was based on Williams' telephone conversation with the official of the Marion school district in which Williams stated that plaintiff had been fired for recording the incorrect time on her time cards.

■ Libel in Iowa is the "malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business." *Plendl v. Beuttler,* 253 Iowa 259, 262, 111 N.W.2d 669, 670–71 (1961). Certain statements are libelous per se,

which means they are actionable in and of themselves without proof of malice, falsity or damage. In actions based on language not libelous per se, all of these elements must be proved ... before re-

covery can be had, but when a statement is libelous per se they are presumed from the nature of the language used. *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968). Words are libelous per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect. *Haas v. Evening Democrat Co.*, 252 Iowa 517, 522, 107 N.W.2d 444, 447 (1961).

 An attack on the integrity and moral character of a party is libelous per se. *Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club*, 215 Iowa 1130, 1137, 245 N.W. 231, 234 (1932). Thus it is libel per se to make a published statement accusing a person of being a liar. *Prewitt v. Wilson*, 128 Iowa 198, 203, 103 N.W. 365, 367 (1905). We find no meaningful distinction between accusing a person of being a liar and accusing a person of falsifying information. Therefore we hold that the trial court was right in instructing the jury that Williams' accusations to that effect were libelous per se.

 The court gave a different instruction on the slander issue. Instead of informing the jury that Williams' statement to the official of the other school district was slander per se, the court left it to the jury to determine whether the statement would be understood as slanderous per se. The rule is that when the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court. If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed. *Berger v. Freeman Tribune Publishing Co.*, 132 Iowa 290, 295, 109 N.W. 784, 786 (1906). This rule is distinct from the rule that words which require extrinsic evidence to show their defamatory meaning are not defamatory per se. *See Shaw Cleaners & Dyers, Inc.*, 215 Iowa at 1134–35, 245 N.W. at 233 (words which are defamatory per se do not need an innuendo, and words which need an innuendo are not defamatory per se).

Because defendants assert the slander claim should not have been submitted at all, we need decide only whether the statement could reasonably·be understood as slanderous per se. Moreover, we are not asked to determine in this case what differences exist in Iowa, if any, in the actionability of libel and slander. *See generally* W. Prosser, *The Law of Torts* § 112 at 751–66 (4th ed. 1971).

 We believe that a statement that an employee was fired for making incorrect entries on her time card could reasonably be taken as imputing dishonesty to the employee. Therefore we find that Williams' statement could be understood as defamatory per se. The trial court did not err in allowing the jury to determine whether the defamatory meaning was the one conveyed.

Because of the presumption of malice, falsity and damage from statements that are defamatory per se, we have no occasion to address defendants' contentions, contingent on a contrary holding, that the evidence was insufficient for submission of those issues.

 B. *Qualified privilege.* The doctrine of qualified privilege is explained in *Brown v. First National Bank of Mason City*, 193 N.W.2d 547, 552–53 (Iowa 1972), and *Vojak*, 161 N.W.2d at 105. A qualified privilege applies to statements without regard to whether they are defamatory per se when they are made on an appropriate occasion in good faith on a subject in which the communicator and addressee have a shared interest, right or duty. Details of the doctrine are explained in the cases.

 Qualified privilege is an affirmative defense that must be pleaded and proved. Ordinarily the availability of the privilege is for the court rather than the jury to decide. *See Brown*, 193 N.W.2d at 552. The privilege protects only statements made without actual malice. Thus a publication loses its character as privileged and is actionable on proof of actual malice.

The malice that is presumed in defamation per se is the kind of malice that our cases call implied malice or malice in law. The want of legal excuse for the act amounts to malice without regard to the motive for the statement. This kind of malice is distinct from actual malice, also called express malice, which does depend on the motive for the statement. Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive. *See Ott v. Murphy*, 160 Iowa 730, 740–42, 141 N.W. 463, 468–69 (1913).

Defendants contend the present defamation action should have been dismissed on the ground of qualified privilege. They assert that the alleged defamatory statements were made only to persons to whom they had a right or duty to communicate them, and they argue that the persons had an interest in the subject. Plaintiff argues that error was not preserved, that the doctrine was inapplicable, and that, if it was applicable, the issue is now moot. We pass the issue of error preservation because even if qualified privilege were available as a matter of law it would not have been a ground for dismissal. Rather, the doctrine would require the plaintiff to prove the statements were made with actual malice in order to recover. *See Vojak*, 161 N.W.2d at 105 ("proof of actual malice destroys the qualified privilege").

The record in this case shows the jury found that plaintiff did prove the statements were made with actual malice. The trial court instructed that plaintiff had to prove defendants defamed her with actual malice before she could recover punitive damages. The court distinguished actual malice from legal malice that is presumed when statements are defamatory per se. Because the jury awarded punitive damages, it necessarily found actual malice had been proven.

Defendants argue this does not moot the qualified privilege issue because plaintiff received an unwarranted benefit from the presumption of legal malice that accompanied the instructions on defamation per se. That benefit would exist, however, even if qualified privilege had been submitted. The effect of the defense, when it is established, is to shift the burden to the plaintiff to prove actual malice in order to recover. It does not change the character of the defamation as defamation per se, and it would put exactly the same burden on plaintiff as she bore in proving her right to punitive damages. Therefore any error of the court in refusing to apply the qualified privilege doctrine did not prejudice defendants' substantial rights.

C. *The negligence standard.* Defendants contend that the trial court erred in instructing on the standard of liability for defamation. They acknowledge that the court instructed in accordance with existing Iowa law but maintain that the existing standard should be modified to adopt the standard mandated for actions by private individuals against media defendants in *Gertz v. Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). They urge that at least proof of negligence should be required, if not proof of knowledge of falsity and reckless disregard of such knowledge. They also urge that punitive damages should be unavailable except on proof of actual malice by clear and convincing evidence. We pass the issue of error preservation.

*Gertz* involved action by a private individual against a media defendant. The Supreme Court held that the states were free under the first and fourteenth amendments of the United States Constitution, "so long as they do not impose liability without fault, ... [to] define for themselves the appropriate standards of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 346–47, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. Punitive damages, however, cannot be recovered unless the plaintiff meets the actual malice standard defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). 418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810–11.

In contrast to *Gertz*, the present case involves a non-media defendant. Thus no constitutional basis for applying the *Gertz* constraints appears. Because the plaintiff is not a public official or public figure, our holding in *Anderson v. Low Rent Housing Commission*, 304 N.W.2d 239 (Iowa 1981), is also distinguishable. In this situation where only a private plaintiff and non-media defendant are involved, the common law standard does not threaten the free and robust debate of public issues or a meaningful dialogue about self-government, or freedom of the press. We refuse to extend the *Gertz* holding to actions between a private individual and a non-media defendant. The same conclusion has been reached in the majority of jurisdictions in which the issue has arisen. *See Schomer v. Smidt*, 113 Cal.App.3d 828, 170 Cal.Rptr. 662 (1980); *Rowe v. Metz*, 195 Colo. 424, 579 P.2d 83 (1978); *Retail Credit Co. v. Russell*, 234 Ga. 765, 218 S.E.2d 54 (1975); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn.1980); *Gengler v. Phelps*, 92 N.M. 465, 589 P.2d 1056 (Ct. App.1978); *Harley-Davidson Motorsports, Inc. v. Markley*, 279 Or. 361, 568 P.2d 1359 (1977); *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 143 Vt. 66, 461 A.2d 414 (1983); *Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141 (1982).

We find no basis for reversal in defendants' challenge to the trial court's submission of plaintiff's defamation claim.

III. *The intentional infliction of emotional distress claim.* Defendants contend the trial court erred in overruling their motion for directed verdict challenging the sufficiency of evidence on plaintiff's claim for intentional infliction of emotional distress. The elements of this tort are:

(1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 129 (Iowa 1983). Defendants argue that plaintiff presented insufficient evidence on the outrageousness and intent elements of the tort. We examine the evidence in its light most favorable to plaintiff in determining whether a jury question was engendered. *Poulsen v. Russell*, 300 N.W.2d 289, 296 (Iowa 1981).

We have recognized that to be outrageous the conduct must be " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harsha v. State Savings Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46, Comment *d* (1965)). It is for the court to determine in the first instance whether the relevant conduct may reasonably be regarded as outrageous. *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983). In making that determination the court should consider the relationship between the parties: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46, comment *e* (1965). An employer thus has a duty to refrain from abusive behavior toward employees. *See Hall v. May Department Stores Co.*, 292 Or. 131, 138, 637 P.2d 126, 131 (1981).

The outrageousness element requires substantial evidence of extreme conduct: "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46 Comment *d, quoted with approval* in *Roalson v. Chaney.* We

must apply this standard in assessing the sufficiency of evidence of outrageousness in the present case.

 The evidence would support a finding that Williams resented plaintiff's questioning of district seniority policy. This had been a source of dispute between plaintiff and Williams during a period of prior employment. A reasonable trier of fact could also conclude that this event combined with plaintiff's concern over breakdown pay triggered resentment in Williams that led him to single out plaintiff's driving for special scrutiny. The first step in defendants' campaign of harassment was to apply pressure by delaying her starting time. Williams and DeWalle knew immediately that this upset her. Moreover Williams resented her recourse to DeWalle as a departure from the proper chain-of-command.

The second step was to conduct a time study of plaintiff's afternoon route. In conducting that study, Williams urged plaintiff to drive in a manner that violated safety standards. Furthermore he clocked only plaintiff's actual driving time, refusing to allow time for her to clean up and close down the bus after her return to the barn. In addition, he refused to allow her the slack time allowed other employees in determining the allotted route time.

The third step was to require plaintiff to report the theoretical route time on her afternoon time cards, despite the fact her pay would be the same whatever time she recorded, despite prior contrary practice of plaintiff and other employees, despite allowing her to report actual times on the morning route, and despite the actual time taken by plaintiff to complete the route. When plaintiff disobeyed the directive, the fourth step was not merely to discipline her for insubordination. Instead she was accused of falsifying the time records, which Williams and DeWalle admitted they knew was an accusation of dishonesty. They also knew plaintiff had not been dishonest.

The fifth step was to persist in the accusation despite knowledge that plaintiff was reporting the time accurately but on a different basis and despite knowledge that the accusation of dishonesty was upsetting to plaintiff. The sixth step was DeWalle's refusal to bring the issue before the school board despite plaintiff's request that it be taken up there. The seventh step was to discharge plaintiff on the ground of dishonesty rather than insubordination. The final step was to report the incident to a prospective employer as if it involved dishonesty, knowing the report would be so received and harm plaintiff's chance of being employed, and knowing that plaintiff had not acted dishonestly. The fact that the entries would not change plaintiff's compensation bears on the gravity of defendants' behavior, and the fact that the system was changed after plaintiff was fired lends support to her claim she was being singled out.

Even though we believe a jury could find defendants engaged in a deliberate campaign to badger and harass plaintiff, we do not believe their conduct rises to the level of extremity essential to support a finding of outrageousness. The jury could find that defendants' actions were petty and wrong, even malicious, but we do not believe a trier of fact could reasonably conclude that the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

The evidence here does not match evidence in cases where sufficient evidence of outrageousness was found. *See, e.g., Wambsgans v. Price,* 274 N.W.2d 362 (Iowa 1979); *Meyer v. Nottger,* 241 N.W.2d 911 (Iowa 1976); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3rd Cir.1979); *M.B.M. Co. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980); *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal. Rptr. 88, 468 P.2d 216 (1970); *Beavers v. Johnson,* 112 Ga.App. 677, 145 S.E.2d 776 (1965); *Dawson v. Associates Financial Services Co. of Kansas,* 215 Kan. 814, 529 P.2d 104 (1974); *Agis v. Howard Johnson Company,* 371 Mass. 140, 355 N.E.2d 315 (1976); *Hall v. May Department Stores Co.; Contreras v. Crown Zellerbach*

*Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977). The evidence is more closely analogous to that in cases where it has been deemed insufficient. *See, e.g., Harsha v. State Savings Bank*, 346 N.W.2d 791 (Iowa 1984); *Roalson v. Chaney*, 334 N.W.2d 754 (Iowa 1983); *Amsden v. Grinnell Mutual Reinsurance Company*, 203 N.W.2d 252 (Iowa 1972); *Hixon v. State Compensation Fund*, 115 Ariz. 392, 565 P.2d 898 (Ariz.Ct.App.1977); *Henderson v. Ripperger*, 3 Kan.App.2d 303, 594 P.2d 251 (1979); *Pakos v. Clark*, 253 Or. 113, 453 P.2d 682 (1969); *Browning v. Slenderella Systems of Seattle*, 54 Wash.2d 440, 341 P.2d 859 (1959); *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963). We find that the evidence of outrageousness was not substantial in the present case. This makes it unnecessary to address the sufficiency of evidence on the second element of the tort.

We hold that the trial court erred in overruling defendants' motion for directed verdict on the intentional infliction of emotional distress claim. Therefore we reverse the awards of compensatory and punitive damages based on that theory.

■ IV. *Breach of contract.* The breach of contract theory was based on the alleged absence of good cause for plaintiff's firing. Pursuant to her written contract with the district, plaintiff could be discharged summarily only for cause. Plaintiff offered evidence from which the jury could find the time card dispute was orchestrated by defendants to establish a pretext for discharging her. If the jury believed this evidence, it could find she was discharged without good cause. The trial court did not err in submitting this claim.

V. *Damages.* Defendants contend the trial court should have remitted the compensatory damages award for defamation or ordered a new trial on that claim. They also contend that the punitive damage awards should have been set aside. Their arguments concerning duplication of recovery of damages for defamation and intentional infliction of emotional distress are moot because of our reversal of the recovery for the latter tort.

■ A. *Compensatory damages for defamation.* Defendants' complaint that the $59,500 defamation award was excessive raises an issue of substantiality of the evidence of damages. In addition to reputational damage, the court authorized recovery for any loss of income not included in plaintiff's breach of contract recovery, for emotional distress exclusive of that caused by the separate tort, for medical and hospital expense, for physical pain and suffering, for medical and hospital services attendant to her mental anguish, for medical and hospital services for physical harm, and for personal humiliation and embarrassment. Defendants did not object to the instruction submitting these elements of damage. *See generally* Restatement of Torts (Second) §§ 620–63 (1977).

Substantial evidence supported these submissions. Plaintiff was forty-four years old and had been unemployed since defendants discharged her. The jury could find the defamatory statements hurt her job prospects and caused loss of future earnings. Moreover, her health went from good before the tort to bad afterwards. She suffered severe emotional distress and was hospitalized on three separate occasions with serious physical problems, suffered severe stomach pain, nausea, digestive distress and considerable anxiety. She could not finish meals without vomiting, suffered from insomnia and withdrew from social contacts. Her medical bills alone totalled more than $5,000. We do not believe the trial court abused its discretion in refusing to remit or grant a new trial on defendants' motion alleging the defamation award was excessive.

B. *Punitive damages.* Defendants argue that the school district was immunized from liability by an amendment to Iowa Code section 613A.4 (1981). *See* 1982 Iowa Acts ch. 1018, § 5. The amendment adds claims for punitive damages to the list of exemptions from municipal tort liability. *Id.*

■ Assuming without deciding that no problem of error preservation exists, the

issue is whether the amendment is applicable to causes of action arising prior to its effective date. The amendment is silent on the subject. It is therefore presumed to be prospective only in its application. Iowa Code § 4.5 (1983). If the amendment is remedial only, however, it is applicable retrospectively. *See State ex rel. Turner v. Limbrecht,* 246 N.W.2d 330, 332–34 (Iowa 1976).

■ We find that the amendment is substantive rather than merely remedial. It takes away a right of recovery that previously existed and does not give a party a remedy where none or a different one existed previously. *See id.* The amendment is therefore not applicable to plaintiff's action. *See Benton County v. Wubbena,* 300 N.W.2d 168, 170 (Iowa 1981).

We find no merit in defendants' attack on the defamation damage awards.

VI. *Evidentiary rulings.* Defendants contend that the trial court erred in overruling their objections to admissibility of a videotape of another driver driving plaintiff's route, alleged hearsay, and evidence that the time-card system was changed after she was fired. We find no reversible error in the court's rulings.

■ The videotape was offered to acquaint the jury with practices plaintiff insisted were essential for her route to be driven safely. Plaintiff sought to negate any suggestion that she was not a safe driver and that the precautions she took in driving were unnecessary. This evidence was relevant to her breach of contract claim and her assertion that defendants acted unreasonably in reducing her route time. The trial court had discretion to receive this demonstrative evidence. *See Palleson v. Jewell Cooperative Elevator,* 219 N.W.2d 8, 15–16 (Iowa 1974). That discretion was not abused here.

■ Evidence was admitted that defendants objected to as hearsay, and defendants contend the trial court erred in overruling their objections to it. Two statements allegedly made by Williams

were admitted. One was that he purportedly said, "I'll fire anyone around here who won't keep their damn mouth shut," referring to a complaint by a driver having a problem on her route. The second was an alleged statement by Williams in which he advised a driver to "push [the children] out the door and hope the door didn't hit them in the ass." These statements were obviously not hearsay because they were admissions. *See State v. Kidd,* 239 N.W.2d 860, 864 (Iowa 1976); Iowa R.Evid. 801(2).

Alleged hearsay statements of others were also admissible, within the trial court's discretion, under exceptions to the hearsay rule.

■ Finally, the trial court did not err in receiving evidence that defendants abandoned the time card system after firing plaintiff. The court could reasonably conclude this evidence was relevant to her claim that the time card dispute with her was pretextual.

■ VII. *Conduct of counsel.* Defendants alleged plaintiff's counsel was guilty of misconduct in making remarks and conducting the examination of witnesses during trial. Very few examples are produced from the 1153-page transcript. Moreover, even fewer objections were made and the issue was not raised in the trial court either by motion for mistrial or for new trial. Error was not preserved on this issue. *See Laguna v. Prouty,* 300 N.W.2d 98, 101 (Iowa 1981).

We have considered all of defendants' contentions and arguments whether they are specifically addressed in this opinion or not, and we find reversible error only in the submission of the claim for intentional infliction of emotional distress.

AFFIRMED IN PART AND REVERSED IN PART.