**John B. MARKS, Appellant,**

v.

**The ESTATE OF Kenneth HARTGERINK, John J. Schneiderman, Marvin H. Westendorf, and Leslie Van Raden, Appellees.**

No. 93–1624.

Supreme Court of Iowa.

March 29, 1995.

Rehearing Denied April 26, 1995.

ANDREASEN, Justice.

A church member, whose church membership had been taken away, sued church officials for defamation and intentional infliction of emotional distress. The district court granted the church officials' motion for summary judgment and dismissed the case. On appeal, we affirm.

I. *Background.*

In 1990 John B. Marks' membership in the Trinity Reformed Church of Allison, Iowa (Trinity) was suspended and he was later excommunicated in a disciplinary action taken by Trinity's governing body. Trinity is a part of the national organization, the Reformed Church of America. The national organization is a hierarchical body with an established structure and procedures. The local governing body is the consistory, which is made up of the installed ministers of the local church, the elders, and the deacons. The members of the board of elders are the elected spiritual leaders of the church and have the power to discipline members of the congregation. That power includes the power of excommunication. Defendant Kenneth Hartgerink, now deceased, was the pastor at Trinity when Marks was excommunicated. Defendants John J. Schneiderman, Marvin H. Westendorf, and Leslie Van Raden were elders.

Marks has been a member of the church for most of his life. His parents were founding members of Trinity, and his father donated the land where the church is now located. Marks' concern about the direction the church was taking began in 1986 when his wife lost her job as janitor of the church and Reverend Muller, the pastor serving Trinity at the time, introduced the practice of spiritual healing. The introduction of spiritual healing caused discord in the congregation. Marks became involved in a movement to remove Muller from the church. Muller left Trinity in February 1989. Before Muller left, he and Marks engaged in a confrontation in the church after a meeting. Both were reprimanded.

Reverend James Medendorp, pastor at the nearby Dumont Reformed Church, became

Joseph M. Isenberg, Ames, for appellant.

Stephen J. Powell and Samuel C. Anderson of Swisher & Cohrt, Waterloo, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, ANDREASEN, and TERNUS, JJ.

moderator and superintendent of Trinity after Muller left. There was great discord at Trinity, so Medendorp asked Reverend Hartgerink to come to Trinity as interim pastor. Hartgerink was specially trained in interim ministry to assist troubled churches through their difficulties and make them viable churches again. Marks became angry with Hartgerink because he thought that Hartgerink was encouraging his wife to divorce him and his son to disobey him.

In April 1990 the board of elders temporarily suspended Marks' privileges of membership and barred him from attending the church services. The congregation was informed of this move. Later the elders asked the police to be present at the church in case Marks showed up and attempted to disrupt services.

On May 31, 1990, Leslie Van Raden wrote a letter making formal charges against Marks. The charges instituted excommunication proceedings. The full text of the letter reads:

May 31, 1990

Dear Mr. Clerk:

I feel that the time has come to place before the elders of the Trinity Reformed Church the formation of actual written charges against Mr. John Bernard Marks as a member of the Trinity Reformed Church. These charges come only after much prayer and serious consideration and are being brought forth out of great concern for the well-being of all members of Christ's Church here at Trinity, both for the present and for the future. The specific charges which are to follow do not come out of any personal vendetta towards Mr. Marks but rather out of the deep desire for the problems to be resolved for our Church. It appears that everyone involved is anxious to get this over with so that we can all get on with our lives. The charges which I am about to present involve the offensive behavior patterns of Mr. Marks as witnessed to over a period of time. Some of these offensive behaviors I have witnessed personally; others come from the shared testimony of others. I am hereby charging him with abusing his privileges as a member of the church and for disrupting the communion of the body of Christ. The examples of the offensive behaviors are as follows: First of all, there have been the relentless and demanding phone calls from Mr. Marks over a period of the past several months. This includes the many, many phone calls I have personally received, as well as that reported to me by Pastor Medendorp, Pastor Hartgerink and the other elders. These phone calls have been offensive, abusive, harassing, disruptive and threatening in nature. Mr. Marks has personally made such statements about Pastor Hartgerink to me as: "Pastor Ken is a dirty sucker"; "It takes a lot of guts and shit"; "He is a life wrecker, traitor and marriage wrecker"; "I'm going to an institution because of him"; "My teeth will go a long ways in Pastor Ken"; "I'm going to kick him in the shins".

Second, Pastor has shared with me that on April 5 he endeavored to visit Mr. Marks' son Curtis at the Marion Health Center in Sioux City, Iowa. I understand that he had received prior approval for a visit with him and that Mr. Marks somehow was able to get that visit cancelled after Pastor Ken had traveled the distance to be of help to Curtis. I understand that no parishioner is allowed to interfere with help and counsel offered to another member.

Third, Pastor Hartgerink shared with me that he had received a phone call on the morning of April 28 and that Mr. Marks demanded to know what was in the letter sent to him on April 18 by the board of elders. After Pastor Ken told him that the elders decided to temporarily suspend him from the privileges of membership that he reacted angrily with "up your ass-hole".

Fourth, On or about April 28 Mr. Marks also phoned myself and John Henning, as well as Pastor Medendorp during the same period of time, and demanded a meeting with the consistory on Sunday April 29 and if he did not get his way that he would actually disrupt that morning's worship services. Mr. Marks phoned late that night of April 28 and demanded that I should go over to Pastor Ken's house and "kick him out".

Fifth, On Sunday A.M. April 29 Angie Hartgerink answered the parsonage phone and after telling who he was Mr. Marks asked if "Judas was there"?, then went on to ask her "what it was like to live with a Judas"? He also asked her what she thought of "someone who breaks up a marriage"? He also informed her that he "got his directions from God" and that "God was on his side". At about this time Mr. Marks also referred to me as "Judas". To the best of my knowledge I have stated the above as accurately as possible.

A trial to the church judiciary was held on June 30, 1990 and Marks was found guilty of the charges. He was notified that if he failed to show marks of repentance, the board of elders would proceed to excommunication.

At a July 16, 1990 meeting between Marks and the elders, the conversation heated up and defendant Westendorf exploded and called Marks a "lying bastard." Westendorf has apologized to Marks for the outburst. Later, the board of elders met and voted to excommunicate Marks. The board sent Marks a letter dated July 18 informing him that he would be excommunicated from the church effective July 21. The congregation was informed on July 22 that Marks had been excommunicated.

On September 26, 1990 the clerk of the consistory sent a letter to Marks informing him that the consistory of the church, including Reverend Hartgerink, would no longer accept any telephone calls from him and that any future calls from him would be considered harassment.

In December 1990, Trinity hired a new pastor to start in February of 1991. The new pastor decided not to become involved in the former conflict. He asked the board of elders to write Marks a letter informing him that he would not accept his phone calls.

Marks filed an action for defamation and intentional infliction of emotional distress against the defendants. He alleged that nine statements made by the defendants were defamatory and constituted outrageous conduct.

(1) A letter dated April 18, 1990 informing Marks he was being temporarily suspended from privileges of membership and attending services and setting forth the reasons for the suspension.

(2) An oral communication to the church members that Marks' privileges of membership and attending services were temporarily suspended.

(3) A letter dated July 18, 1990 informing Marks he was excommunicated from the church.

(4) An oral communication to the church members that Marks had been excommunicated.

(5) Statements made the week of July 22 through July 28, 1990, allegedly informing church members not to communicate with Marks.

(6) The May 31, 1990 letter initiating excommunication proceedings against Marks.

(7) An October 9, 1990 letter from the board of elders mentioning Marks' excommunication.

(8) The September 26, 1990 letter informing Marks that any attempts to call Hartgerink and the members of the consistory would be considered harassment.

(9) The December 31, 1990 letter informing Marks that the new pastor would not accept his telephone calls and that any calls to him would be considered harassment.

The defendants answered and filed a motion for summary judgment. In its ruling the district court granted summary judgment on all the alleged defamatory statements except the May 31 letter. The court also granted the defendants' motion for summary judgment on the intentional infliction of emotional distress claim. The defendants filed a motion to reconsider the ruling on the May 31 letter. On reconsideration, the court granted summary judgment with regard to the May 31 letter, ruling that a qualified privilege protected the statements made in the letter. Marks appeals.

II. *Standards for Summary Judgment.*

The standards for determining whether a controversy is properly resolved by summary judgment are well established.

Summary judgment is proper when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. The burden of showing the nonexistence of a material fact is upon the moving party. While an adverse party generally cannot rest upon his pleadings when the moving party has supported his motion, summary judgment is still not proper if reasonable minds could draw different inferences and conclusions from the undisputed facts. In this respect, summary judgment is functionally akin to a directed verdict; every legitimate inference that reasonably can be deduced from the evidence should be afforded the non-moving party, and a fact question is generated if reasonable minds can differ on how the issue should be resolved.

*Behr v. Meredith Corp.*, 414 N.W.2d 339, 341 (Iowa 1987) (citation omitted).

■ Although intentional torts are generally poor candidates for summary judgment because of the subjective nature of motive and intent, the rule is not absolute. *Id.* For example, the party resisting summary judgment "may not rest upon the mere allegations or denials of his pleading." Iowa R.Civ.P. 237(e). The resistance must set forth specific facts constituting competent evidence to support a prima facie claim. *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 338 (Iowa 1991).

■ Also, summary judgment is afforded a unique role in defamation cases. *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 889 (Iowa 1989) (citations omitted). "In the context of a defamation action, 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986)). Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding this appeal, "we must determine whether any facts have been presented over which a reasonable difference of opinion could exist that would

affect the outcome of the case." *Id.* (citing *Behr*, 414 N.W.2d at 341).

### III. *Ecclesiastical Matters.*

Marks exhausted the available appeals within the national organization's hierarchical system. When the elders' decision was affirmed by the classis, an appeal was taken to the regional synod, the final court of appeal from all cases originally heard by a board of elders. The church synod affirmed the decision to excommunicate him at both levels of appeal. He now turns to the civil courts in essentially another attempt to contest his excommunication. He asserts that proper procedures were not followed in the excommunication proceedings.

■ The general rule is that civil courts will not interfere in purely ecclesiastical matters, including membership in a church organization or church discipline. 66 Am.Jur.2d *Religious Societies* §§ 31, 34 (1973); Annotation, *Suspension or Expulsion from Church or Religious Society and the Remedies Therefor*, 20 A.L.R. 421 (1951 & 1994 Supp.). Iowa's civil courts have a long tradition of refraining from interfering in purely ecclesiastical matters. *See, e.g., Third Missionary Church of Davenport v. Garrett*, 158 N.W.2d 771, 776 (Iowa 1968); *Brown v. Mt. Olive Baptist Church*, 255 Iowa 857, 859, 124 N.W.2d 445, 446 (1963); *Bird v. St. Mark's Church of Waterloo*, 62 Iowa 567, 573, 17 N.W. 747, 750 (1883); *Sale v. First Regular Baptist Church of Mason City*, 62 Iowa 26, 29, 17 N.W. 143, 145 (1883).

*Brown* was also a suit by individuals who had been expelled from church membership. The plaintiffs in that case sought injunctive relief from their expulsions. Our statement in *Brown* reflects our approach to cases involving church matters:

[O]rdinarily the courts have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies, including membership in a church organization, but they do have jurisdiction as to civil, contract, and property rights which are

involved in or arise from a church controversy.

*Brown*, 255 Iowa at 859, 124 N.W.2d at 446.

■ Trinity's decision to excommunicate Marks was purely ecclesiastical in nature, and therefore we will not interfere with the action. Interfering with the decision would contravene both our history of leaving such matters to ecclesiastical officials and the First and Fourteenth Amendments of the United States Constitution. *See Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 698, 96 S.Ct. 2372, 2375, 49 L.Ed.2d 151, 156 (1976).

## IV. *Defamation.*

Marks asserts that although the alleged defamatory statements were made in an ecclesiastical context, defamation involves his civil rights and therefore it is appropriate for a civil court to exercise jurisdiction over his claim.

### A. Publication.

■ To prevail, Marks must prove that the alleged defamatory statements were published. *See Royston v. Vander Linden*, 197 Iowa 536, 536, 197 N.W. 435, 436 (1924). "It is elementary that one cannot be liable for slander by the use of defamatory language which is heard only by the party to whom the words refer." *Id.* Marks admitted he had no evidence that the April 18, July 18, September 26, and December 31 letters had been sent to anyone other than him. Other than Marks, the only persons who saw the letters were shown them by Marks himself. As a matter of law, Marks cannot prevail on the statements in these four letters.

### B. Truth.

■ Truth or substantial truth is a complete defense to defamation. *Hovey v. Iowa State Daily Publication Bd.*, 372 N.W.2d 253, 255 (Iowa 1985); *Vojak v. Jensen*, 161 N.W.2d 100, 108 (Iowa 1968). The oral communications to church members that Marks' membership was being temporarily suspended and that he had been excommunicated merely conveyed true information to the congregation. Marks admitted there was noth-

ing untrue about the statements read to the congregation. The statement in the October 9, 1990 letter referring to Marks' excommunication was also admittedly true. No action for defamation may lie on these true statements.

### C. Lack of Evidence.

■ There is no evidence on the record supporting Marks' claim that statements were made during the week of July 22 through July 28, 1990 advising members not to communicate with him. Summary judgment on a claim is appropriate when there is no evidence supporting the claim. *Hoefer*, 470 N.W.2d at 338.

### D. Qualified Privilege.

The defendants claim the statements in Leslie Van Raden's May 31 letter were made in the course of church discipline and therefore are protected by a qualified privilege. Marks disputes this but asserts that even if there is a qualified privilege, the statements were made with actual malice, removing them from the protection of the privilege.

■ A statement is said to be privileged when one is justified in communicating defamatory information which would ordinarily be actionable without incurring liability. *Vojak*, 161 N.W.2d at 105. To say a statement is privileged simply means no liability attaches to its publication. *Id.* A privilege may either be absolute or qualified. *Id.* "The qualified privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within narrow limits." *Id.* (citation omitted).

■ A qualified privilege applies to otherwise defamatory statements when the statements are "made in good faith on any subject matter in which the person communicating has an interest, or in reference to which that person has a right or duty, if made to a person having a corresponding interest or duty in a manner and under circumstances fairly warranted by the occasion." *Knudsen v. Chicago & N.W. Transp. Co.*, 464 N.W.2d 439, 442 (Iowa 1990). The

elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties. *Id.*

Ordinarily the availability of a qualified privilege is for the court rather than the jury to decide. *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984). Other jurisdictions have recognized a qualified privilege for communications made in the course of church discipline. *See, e.g., Joiner v. Weeks*, 383 So.2d 101, 105 (La.Ct.App.1980); *Browning v. Gomez*, 332 S.W.2d 588, 591 (Tex.Civ.App.1960); *see also* Annotation, *Libel and Slander: Privilege as to Communications Respecting Church Matters*, 63 A.L.R. 649 (1929). We believe it is appropriate to apply a qualified privilege to statements made in the context of a church disciplinary proceeding. The May 31 letter constituted formal disciplinary charges against Marks. The statements in the letter were made by a church elder who had a duty imposed by the church to look after the spiritual well-being of the church members. The statements were made only to other church officials who would have a role in the disciplinary proceedings. Any statements made during the course of the ecclesiastical trial would also be qualifiedly privileged.

Even untrue statements may be qualifiedly privileged. *Vojak*, 161 N.W.2d at 105. The privilege, however, only protects statements made without actual malice. *Vinson*, 360 N.W.2d at 116. Actual malice is distinct from the implied malice which is presumed from statements which are defamatory per se. *Id.* Actual malice requires proof that the statement was made with ill-will, hatred, the desire to do another harm, or wrongful motive. *Id.* at 117; *Vojak*, 161 N.W.2d at 107. It may also result from reckless or wanton disregard of the rights of others. *Vojak*, 161 N.W.2d at 117.

Marks asserts there is a genuine issue of material fact about whether the statements were made with actual malice. The evidence does not support his claim. For example, he urges the assistance Medendorp gave Marks' wife in filing commitment papers against him is evidence of actual malice. Medendorp is not a defendant in this case, so his actions are irrelevant to whether these defendants acted with actual malice. Marks also cites a statement made by a one-time elder that the church would be better off without certain families. That evidence is also irrelevant because the man who made the statement is not a defendant and was not on the board of elders when Marks was disciplined. His statement cannot be attributed to the defendants. In examining the record in a light most favorable to Marks, we find as a matter of law that no actual malice exists and the statements are qualifiedly privileged.

## V. *Intentional Infliction of Emotional Distress.*

Marks claims the nine allegedly defamatory comments, writings, and statements constituted outrageous conduct by the defendants which caused him to be severely and emotionally distressed.

Four elements must be established to make a prima facie showing of intentional infliction of emotional distress: (1) outrageous conduct by the defendants; (2) the defendants' intentional causing, or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendants' outrageous conduct. *Vinson*, 360 N.W.2d at 118. It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983). To be outrageous, the conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Vinson*, 360 N.W.2d at 118 (citation omitted). There must be substantial evidence of extreme conduct:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he [or she] has intended to inflict emotional distress, or even that his [or her] conduct has been

characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

*Id.*

■ Marks asserts that the filing of commitment papers against him constitutes outrageous conduct. The papers were executed by Medendorp and Marks' wife. Because neither is a defendant in this action that conduct is irrelevant. The other items Marks cites as outrageous conduct are similarly irrelevant. Although Marks is understandably disappointed with the actions taken by the defendants, we do not believe a trier of fact could reasonably conclude their conduct rose to the level of outrageousness. Summary judgment on this claim was also proper.

**AFFIRMED.**