Patrick Troy **KELLY**, a/k/a Pat Kelly, Plaintiff-Appellant/Cross-Appellee,

v.

**IOWA STATE EDUCATION ASSOCIATION, James Sutton, and John Phillips,** Defendants - Appellees/Cross - Appellants.

No. 84–274.

Court of Appeals of Iowa.

May 28, 1985.

Gordon K. Darling of Darling, Chickering & Darling, Winterset, and Lennis J. Holm of Anderson, Werner & Holm, Creston, for plaintiff-appellant/cross-appellee.

James L. Sayre and Gerald L. Hammond of Sayre & Gribble, P.C., Des Moines, for defendants-appellees/cross-appellants.

Heard by DONIELSON, P.J., and SNELL and SCHLEGEL, JJ.

SCHLEGEL, Judge.

Plaintiff, Patrick Kelly, appeals an order of the district court that sets aside the jury verdict in favor of Kelly and grants a new trial. Defendants—John Phillips, James Sutton, and the Iowa State Education Association—cross-appeal. They assert that the trial court erred: (1) in failing to grant a directed verdict and judgment notwithstanding the verdict, and (2) in making certain evidentiary rulings. We reverse the grant of a new trial and affirm the jury verdict.

*I. Facts.* This is an action for libel. Kelly is a professional educator and is the Executive Administrator of Area Education Agency 14 (AEA–14). AEA–14 is one of fifteen agencies in the State of Iowa that furnish special education services to school districts within each agency's assigned area. AEA–14 is also known as Green Valley AEA, and the agency's headquarters are located in Creston. Kelly has been Executive Administrator of AEA–14 since the agency's inception in 1975.

Defendant Iowa State Education Association (ISEA) is an association of professional educators and teachers in Iowa. Among other things, the ISEA serves as a collective bargaining organization for its members. Both Phillips and Sutton are employees of ISEA. Phillips is assigned to ISEA's Southwest UniServe Unit, a district with boundaries that partially overlap the boundaries of AEA–14.

The events leading up to the alleged libel began December 17, 1981, at a public meeting before the Board of the Iowa Department of Public Instruction. Kelly and the heads of the other fourteen AEA's made presentations at that meeting. Jim Sutton was at the meeting for ISEA, taking notes of the presentations and budget proposals of each AEA in an effort to gather information for future collective bargaining.

Sutton later prepared a report from his notes. Included in the report was a segment on Kelly's presentation. On January 8, 1982, Sutton's report was circulated by ISEA to UniServe directors serving AEA affiliates, chief negotiators, and AEA affiliates. John Phillips received a copy of the report, and the segment about Kelly caught his eye. Phillips decided to include the segment about Kelly in a newsletter sent to ISEA members in the Southwest UniServe Unit. In addition, Phillips authored an introductory paragraph that appeared on the front page of the newsletter. That introduction directed the reader's attention to Sutton's segment about Kelly and included some of Phillips' own comments about Kelly. Before circulating the newsletter, Phillips called Sutton and informed him that the report on Kelly's presentation would be included in the newsletter. Phillips and Sutton also discussed the introductory paragraph written by Phillips. The newsletter was circulated on January 22, 1982.

The newsletter contained several references to Kelly that were derogatory. Because the two writings are reproduced in full later in this opinion, only some of those derogatory remarks are recounted here. Among other things, the report by Sutton

hinted that Kelly had previously terminated employees because of their union activity. It also stated Kelly had "slam[med] the folks at home" during his presentation. Phillips' paragraph indicated Kelly consistently looked, talked, and acted foolishly. It also questioned whether Kelly had sold mail order Florida swampland, and urged the newsletter recipients to share the comments about Kelly with others.

Kelly learned of the material within a few days of its circulation. He was not simply offended by contents of the newsletter; he was asked by some school administrators and board members with whom he worked to explain some statements attributed to him in the newsletter. Members of the AEA–14 board learned of the publication and felt strongly enough about the matter to hold a closed meeting to discuss the newsletter.

II. *Legal Proceedings.* Kelly eventually filed suit. He alleged the two writings were false and malicious. He asserted they were intended to expose him to public contempt and ridicule, and to damage his professional reputation, and that they therefore constituted libel per se. He sought actual damages for injury to his professional reputation, humiliation, loss of income, and emotional distress. He also sought exemplary and punitive damages based on the alleged willful, wanton, malicious and reckless intent of defendants in publishing the writings, and upon the asserted defamatory content thereof.

Defendants admitted the writing, publication and dissemination of the documents, admitted they were done by the individual defendants wholly within the scope of their agency and employment by the corporate defendant, ISEA, and with the knowledge and consent of the corporate defendant, ISEA.

As a defense to Kelly's claim, defendants denied that the writings were defamatory and that Kelly had suffered any damages. They also asserted several affirmative defenses, including truth, jest, and various privileges.

A trial was held before a jury. At the close of Kelly's case, defendants moved for a directed verdict. Defendants urged three grounds for directing the verdict: (1) the writings were not libelous per se, (2) Kelly had not shown that the writings were made with "actual malice"; and (3) Kelly failed to prove any damages. The trial court denied the motion.

At the close of defendants' case, the motion for directed verdict was renewed. It was again denied. The trial court then ruled upon the libelous nature of the two writings.

The writing by Phillips states in full:

2. ATTENTION AEA–14 LOCALS

Jim Sutton, ISEA Administrative Lobbyist, covered the recent DPI hearings on AEA budgets.

Sutton's comments concerning AEA–14 Administrator (?) Patrick (Hog Wild) Kelly are at once both insightful and humorous, but, above all, right on target. No AEA chief does a more thorough or more consistent job of looking, talking and acting foolish than does Pat Kelly.

Please share Sutton's comments with the AEA–14 staff who work your school district. Also share the comments with your own staff. Those folks who must work under "Kamikaze Kelly" need all the support you can give them.

TRUE/FALSE?? Before becoming AEA–14 administrator, Pat Kelly sold mail order swamp land for a Florida real estate firm.

The trial court ruled that three portions of this writing were libelous per se. Those portions were: (1) the question mark enclosed in parentheses that was located after the word administrator in the second sentence of the writing; (2) the statement, "No AEA chief does a more thorough or more consistent job of looking, talking and acting foolish than does Pat Kelly"; and (3) the inquiry, "TRUE/FALSE?? Before becoming AEA–14 administrator, Pat Kelly sold mail order swamp land for a Florida real estate firm." The court ruled that the first two portions were libel per se because they reflect adversely on Kelly's profes-

sional skill, competency, and performance. The third portion was ruled libel per se because it implies that Kelly has engaged in criminal or fraudulent activity.

The writing by Sutton states in full:

AEA XIV

Pat Kelly wore a shirt-and-tie this year. Someone must have tipped him off about his arrival last year, looking all the world like an itinerant golf pro. But he maintained his habit of glad-handling (sic) those he was with while slamming the folks at home.

He announced that his staff was heavily involved in the Special Olympics. He passed out free calendars to the state board members. He read "Casey at the Bat" as his way of breaking the ice with the board. Perhaps he could think of nothing else. His presentation had a decidedly Rotarian flair.

Last year, Pat terminated all of his special education consultants in an effort, some think, to eliminate his chief negotiators and other Association leaders. Then he wrote the job descriptions for all his psychologists. He justified this to the state board by saying that these were all part of his "trying to stretch dollars while providing better services." After firing his curriculum consultants, he farmed out the work to "part-time and non-professional people who would be certifiable for employment." According to Pat, "The Superintendents in the local area met today and were pleased with the way things were going."

It must be a strange group of superintendents who prefer "certifiable" professionals to "certified" professionals.

Negotiations are over at AEA XIV, reflecting perhaps the reign of terror wrecked last year. Pat says, "We're having our best year." He'd been asked to speak at the National Association of School Administrators in New Orleans. Pat has an interesting notion of what constitutes a "best year."

He's also been to four out-of-state drive-in conferences because "it's part of our obligation." It might be noted that other AEAs who laid off staff found it equitable to freeze all out-of-state travel for administrators and others.

Pat allowed that he was no longer superintendent of Prescott. No one ever asked if he had been earning two salaries. He dumped on Prescott a bit by announcing that he saw "the beginning of a voucher system down there: People are taking their kids out of Prescott to study in Creston." He hit Clearfield a bit by announcing the enrollment had increased from 125 to 127. "How long can this go on?" he said, and, answering his own question, added, "The answer is ... forever." And why does Clearfield do this? "They get into their own league, and, you know, being the best among the worst isn't too bad." Things are so bad in Clearfield, that even Diagonal didn't want it.

Pat wondered aloud at the proposal by one of his AEA board members (from Red Oak) to pull Red Oak out of Pat's AEA and merge it instead with Area XIII. If he'd listen to himself once in a while, he'd know why people could go so far as to propose the impossible to put distance between themselves and him. Or, as Pat himself put it, "As much trouble as we've had with Red Oak, we wouldn't care, really."

The trial court ruled that three portions of Sutton's writing were libelous per se. The three portions were the following statements: (1) "Last year, Pat terminated all of his special education consultants in an effort, some think, to eliminate his chief negotiators and other Association leaders"; (2) "He's also been to four out-of-state drive-in conferences because 'it's part of our obligation.' It might be noted that other AEAs who laid off staff found it equitable to freeze all out-of-state travel for administrators and others"; and (3) "Pat allowed that he was no longer superintendent of Prescott. No one ever asked if he had been earning two salaries."

The first portion was found libelous per se because it imputes the termination was for a wrongful purpose in derogation of

Kelly's official duties. The second portion was found libelous per se because it implies a wasteful use of public funds for Kelly's own purposes in derogation of his official duties and budget problems. The third portion was found libelous per se because it leaves the impression of wrongdoing, unauthorized double dipping, and possible criminal or fraudulent activity.

The trial court further ruled that defendants were entitled to the constitutional qualified privilege that arises when the plaintiff in a defamation action is a public official or public figure. *See, e.g., New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public official); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (public figure); *McCarney v. Des Moines Register and Tribune Co.*, 239 N.W.2d 152, 156 (Iowa 1976) (public official). The trial court also ruled defendants were entitled to the common law qualified privilege that protects statements made concerning a common interest. *See, e.g., Brown v. First National Bank of Mason City*, 193 N.W.2d 547, 552 (Iowa 1972) (qualified privilege for communications made in good faith on any subject in which communicator has an interest, right, or duty, if made to person with corresponding right or duty under proper circumstances). Because of these rulings, the jury was instructed that they would have to find actual malice before they could return a verdict in favor of Kelly.

The jury, using structured forms of verdict submitted by the trial court, returned separate verdicts in favor of Kelly and against defendants. Each defendant was assessed compensatory damages of $25,000. In addition, punitive damages were assessed against the ISEA in the amount of $50,000, and against Sutton and Phillips in the amount of $25,000 each. The total award was comprised of $75,000 compensatory damages and $100,000 punitive damages.

After the verdict was announced and judgment entered, defendants filed combined post-trial motions. They moved for judgment notwithstanding the verdict, for a remittitur, and for a new trial. The trial court overruled the motion for judgment n.o.v. without comment. The motion for remittitur was overruled because the court decided it would be an inappropriate remedy in this instance, due to Iowa case law that prohibits remittitur of punitive damages. *See Northrup v. Miles Homes Inc.*, 204 N.W.2d 850, 861 (Iowa 1973). The trial court, however, did grant a new trial because it determined that the verdicts against defendants "were either the result of passion, prejudice or sympathy or were otherwise so excessive such as to shock the judicial conscience of the Court, and said awarded damages are not reasonably consistent with the evidence presented on the question of damages in these proceedings."

Kelly appeals the order granting a new trial. Defendants cross-appeal, challenging the trial court's failure to grant a directed verdict or judgment n.o.v., and challenging certain evidentiary rulings made at trial. We address the issues on cross-appeal first because a ruling favorable to defendants on any of those issues would make a decision of Kelly's appeal unnecessary. Our review of this action at law is for correction of errors of law only. Iowa R.App.P. 4.

III. *Failure to Grant a Directed Verdict or Judgment N.O.V.* Defendants' first argument on cross-appeal is that the trial court erred when it failed to grant a directed verdict or judgment n.o.v. in favor of defendants. They assert two grounds in support of their argument. We consider each below.

A. *Erroneous Finding of Libel Per Se.* Defendants argue the trial court erred in ruling that portions of the writings at issue were libelous per se. As the discussion below points out, determining whether a potentially libelous statement is libel "per se" is strictly a matter of law which affects the elements that a plaintiff must prove to prevail. Thus, even though a statement is not deemed to be libelous per se, a plaintiff may generate a jury question by presenting appropriate evidence. We have examined the record and find that Kelly present-

ed evidence which would generate a jury question even if defendants' writings were not libelous per se. Therefore, the question whether those writings were indeed libel per se is irrelevant to defendants' claim that the trial court should have granted a directed verdict or judgment n.o.v. However, the trial court's ruling that defendants' writings were libelous per se is relevant to the proper determination of damages and thus, to Kelly's appeal of the order granting a new trial. Because of that relevance, we address defendants' argument that the writings were not libel per se.

 Defendants argue that the writings were not libelous per se because the writings were true or, in some instances, made in jest. This argument indicates misunderstanding of what constitutes libel and libel per se. Libel in Iowa is the malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule or to injure the person in the maintenance of the person's business. *Vinson v. Linn-Mar Community School District*, 360 N.W.2d 108, 115 (Iowa 1984). If libel is deemed to be "per se," a plaintiff need not prove malice, falsity, or damage to prevail in an action. *Id.* The truth or falsity of a statement does not affect the determination whether the statement is libelous per se. *See id.* at 116. Thus, although assertions of truth or jest were defenses to Kelly's claims, they are irrelevant to the defendants' assertion that the writings were not libel per se.

 Defendants also argue that the Iowa case of *Vojak v. Jensen*, 161 N.W.2d 100 (Iowa 1968), has limited the class of statements that can be libelous per se to those that charge business incompetence or lack of skill in a person's trade, profession, or office. Defendants thus argue that any statements which the trial court found to imply fraud, criminal activity, or disregard of Kelly's official duties cannot be libel per se. This argument has no merit. Libel per se is not limited to certain charges. The passage in *Vojak* cited by defendants clearly states that the charges listed are "among" statements that are libelous per se. *Id.* at 104. Statements of any nature can be libelous per se. All that must be determined is that the court can presume as a matter of law that publication will have a libelous effect. *See Vinson*, 360 N.W.2d at 116. *See generally* Restatement (Second) of Torts § 569 (1977) (all libel actionable without proof of special harm); W. Prosser, *Law of Torts* 754–760 (4th ed. 1971) (recognizing several types of charges that are actionable without proof of damages).

 Defendants' final argument on this issue is that their writings cannot be libelous per se because no derogatory meaning is present in the statements themselves; such meaning only arises by inference. Iowa case law, however, shows that this argument is not sound. In *Vojak v. Jensen*, a case cited frequently by defendants, the supreme court found two letters to be libelous per se, 161 N.W.2d at 109, even though no statement in either letter explicitly charged the plaintiff with business incompetence or lack of skill. *Id.* at 103–04. Similarly, in *Vinson* the supreme court held that a statement that an employee was fired for making incorrect time card entries could be understood as imputing dishonesty to the employee, and could therefore be defamatory per se. 360 N.W.2d at 116. *See also Haas v. Evening Democrat Co.*, 252 Iowa 517, 533, 107 N.W.2d 444, 454 (1961) (statement that there was "no honorable reason" for advocating the position plaintiff advocated could be charge of dishonor or shamefulness, and was thus defamatory). As Dean Prosser stated:

> There must be, however, a defamatory meaning conveyed.... The form of the language used is not controlling, and there may be defamation by means of a question, an indirect insinuation, an expression of belief or opinion, or sarcasm or irony. The imputation may be carried quite indirectly....

Prosser, *supra*, at 746–47.

 We realize that the *Vinson* case indicates that when the language of the

publication is ambiguous, it is for the jury to decide whether a defamatory meaning was conveyed. 360 N.W.2d at 116. *See also* Prosser, *supra,* at 747–48. But if the language is of such a nature that the court can presume that publication will have libelous effect, it is for the court to rule that the publication is libel per se. *See Vinson,* 360 N.W.2d at 116.

■ Applying the rules of law set out above, we hold that the imputations in defendants' writings—as determined by the trial court—are of such a nature that they constitute libel per se.[1]

■ B. *Evidence of Actual Malice.* Because defendants were protected by constitutional and common law qualified privileges, Kelly had the burden of proving that defendants acted with actual malice. *Vinson,* 360 N.W.2d at 116; *McCarney v. Des Moines Register and Tribune Co.,* 239 N.W.2d at 155–56. Defendants assert that Kelly presented no evidence of actual malice, and that they should have been granted a directed verdict or judgment n.o.v. because of Kelly's lack of proof. Because of the constitutional aspects of the privilege involved here, we must make an independent review of the evidence of actual malice; the question whether the evidence presented in a defamation trial is sufficient to strip a statement of first amendment protection "is not merely a question for the trier of fact." *Bose Corp. v. Consumers Union,* —— U.S. ——, ——, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984).

■ 1. *The Legal Standard.* "Actual malice" sufficient to defeat the constitutional qualified privilege requires a showing that "the statement is made with knowledge it is false or with reckless disregard for its truth or falsity." *McCarney,* 239 N.W.2d at 156.

Actual antagonism or contempt has been held insufficient to show malice. So has intent to inflict harm. There must be an intent to inflict harm *through falsehood.*

*Id.* (citations omitted) (emphasis in original). Clear and convincing proof of knowledge of falsity or reckless disregard for the truth must be shown. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 332, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 800 (1974).

"Knowledge of falsity" does not need any explanation. The meaning of the term "reckless disregard," however, has been explained by the courts. In *McCarney* we find the following summary of what constitutes reckless disregard:

"Reckless disregard" has been held to mean a "high degree of awareness of probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964). It has also been said some suspicion as to the falsity of the statement must be shown to establish "reckless disregard." *Time, Inc. v. McLaney,* 406 F.2d 565, 573 (5th Cir.), *cert. denied* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). "Serious doubt" as to the truth of the statements published was required in the case of *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968), where the court said:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

239 N.W.2d at 156.

■ It is clear, then, that the test of actual malice focuses on the state of mind of the defendant at the time the statement was made. Thus, negligent publication of a false defamatory statement is not actionable when the defendant was acting under the mistaken belief that the statement was true. *See id.* The defendant, however, cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."

---

1. We do not address the issue whether the trial court should have allowed the jury to decide if the six statements in question actually conveyed the defamatory meaning determined by the court, because defendants did not raise this issue at trial or on appeal.

*St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 267 (1968).

The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267–68 (footnote omitted).

2. *Application of the Legal Standard.* We will examine the evidence relating to each statement that the trial court held to be libelous per se, and will determine whether the evidence is sufficient to support a finding of actual malice. Before making that determination, however, we must comment on one aspect of this case not raised by the parties.

The aspect we refer to relates to the possible defense of privileged opinion. It could have been argued that the statements held to be libelous per se were simply expressions of Phillips's and Sutton's low opinion of Kelly, and were therefore absolutely privileged by the first amendment of the United States Constitution.

In *Gertz v. Welch,* the United States Supreme Court stated:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false state-

ments of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues.

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). The federal courts have treated this statement of dicta as controlling constitutional law and have provided full immunity to statements of opinions. *Ollman v. Evans,* 750 F.2d 970, 974–75 and n. 6 (D.C.Cir.1984) (en banc). However, defendants have not urged on appeal that their writings are constitutionally protected opinion. They therefore have waived that precise issue, and we decline to consider it further. Instead, we will review the case in the same manner that the jury was instructed to review it.[2] We will view the libelous statements as statements of fact which assert the meaning imputed to them by Kelly. *See Brown v. First National Bank of Mason City,* 193 N.W.2d 547, 553 (Iowa 1972) (truth of statements to be considered in the sense imputed to them by plaintiff).

We now examine each statement found to be libel per se and any corresponding evidence of actual malice.

"AEA–14 Administrator(?)"

and

"No AEA chief does a more thorough or more consistent job of looking, talking and acting foolish than does Pat Kelly."

▮ The meaning imputed by these statements, as determined by the trial court, is that Kelly is not a competent administrator. Adequate evidence was presented to show that Phillips made these statements with actual malice. First, it was established by reputation evidence that Kelly was a competent administrator. Second, defendants presented no evidence showing that Kelly was incompetent. Third, Phillips himself testified that he believed Kelly was a fit administrator. The

---

**2.** Because defendants have waived the defense of privileged opinion, we need not determine whether the libelous statements were statements of fact, or were instead expressions of protected

opinion. For an example of how difficult such a determination can be, consult the seven separate opinions filed in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc).

jury could thus find that the imputation of the statements was false. They could also find that Phillips, who personally believed Kelly was competent, had "serious doubts as to the truth of his publication," which would mean he acted in reckless disregard of the truth. *See St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. Reckless disregard of the truth, of course, constitutes actual malice. *McCarney,* 239 N.W.2d at 156.

"TRUE/FALSE?? Before becoming AEA–14 administrator, Pat Kelly sold mail order swamp land for a Florida real estate firm."

The trial court concluded that this statement imputed criminal or fraudulent activity by Kelly. Kelly denied ever acting in such a way. In Phillips's own testimony, he admitted he had no personal knowledge of Kelly's background before becoming AEA–14 administrator. Phillips also admitted that he had no factual basis for the statement. He could not provide any basis for charging Kelly with criminal or fraudulent activity. This evidence is not direct proof that Phillips subjectively thought the imputation was false or had serious doubts of its falsity. However, it is sufficient to support a jury finding that the "publication was [not] indeed made in good faith," *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267, and that Phillips therefore acted in reckless disregard for the truth. *See id.* at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267, 268.

"Last year, Pat terminated all of his special education consultants in an effort, some think, to eliminate his chief negotiators and other Association leaders."

The trial court concluded this statement by Sutton imputed that the termination was for a wrongful purpose in derogation of Kelly's official duties. Kelly presented evidence showing that the terminations were due to a bona fide budget control effort. Sutton testified that he had no personal knowledge of the terminations referred to in the statement; his only knowledge came from other ISEA members.

Sutton could not, however, name any individuals who had expressed a belief that the motive for the terminations was to fire union leaders. He stated that was his own belief. We believe a jury could conclude from Sutton's own testimony about his limited knowledge of the events reported that the statement was not written in good faith, but with reckless disregard for the truth.

"He's also been to four out-of-state drive-in conferences because 'it's part of our obligation.' It might be noted that other AEAs who laid off staff found it equitable to freeze all out-of-state travel for administrators and others."

 The trial court concluded that this statement imputed that Kelly wastefully used public funds for his own purposes without regard for his duties or the AEA's budget problems. Kelly testified that he did not attend any out-of-state conferences and that he did not say he did when he gave his presentation. Sutton maintained that Kelly did say he went to such conferences. Sutton refused to acknowledge the possibility that he had misunderstood Kelly. The jury was thus faced with a credibility issue. If they disbelieved Sutton, they would have to find that he had acted with knowledge that the statement was false.

"Pat allowed that he was no longer superintendent of Prescott. No one ever asked if he had been earning two salaries."

The trial court concluded that this statement imputed wrongdoing, unauthorized double dipping, and possible criminal or fraudulent activity. Kelly was indeed working at two jobs and getting paid for both of them. The record also shows that the AEA–14 board approved of the arrangement.

Sutton testified, however, that salary was not mentioned during Kelly's presentation. He also testified that his personal knowledge of Kelly was limited. The presentation upon which Sutton reported constituted only the second occasion that he had seen Kelly. His first encounter with

Kelly was as an observer of a similar presentation a year earlier. Sutton also testified that his knowledge of Kelly through other persons' comments was quite limited.

■ It is apparent, then, that Sutton did not know whether or not Kelly had been receiving two salaries. His only basis for assuming that Kelly received two salaries was Kelly's own statement about serving as superintendent for Prescott. We believe that a jury question existed whether that statement alone created in Sutton a good faith belief that Kelly was improperly receiving two salaries, or whether Sutton acted with reckless disregard for the truth. In passing upon Sutton's good faith, the jury could consider other evidence presented, including Sutton's demeanor when testifying. *See Melton v. Bow*, 145 Ga.App. 272, 273, 243 S.E.2d 590, 591 (1978) (*all circumstances* must be considered in determining whether actual malice was proved).

The trial court did not err in submitting this case to the jury. Defendants were not entitled to a directed verdict or judgment n.o.v. because of insufficiency of the evidence.

IV. *Evidentiary Rulings.* Defendants assert that the trial court erred in making three evidentiary rulings. The first two rulings excluded certain evidence: (1) a transcript of the closed meeting held by the AEA–14 board, in which several members of the board advised Kelly to sue; and (2) a paragraph of a newspaper article that discussed Kelly's lifestyle and quoted him as saying he didn't worry about small-town gossip. This evidence was excluded on the grounds that it was unfairly prejudicial. *See* Iowa R.Evid. 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).

■ The balancing decision to be made under rule 403 is a matter for the trial court's discretion. *See State v. Williams*, 360 N.W.2d 782, 787 (Iowa 1985). We do not believe the trial court abused its discretion with its rulings. The excluded evidence was, to a certain extent, unfairly

prejudicial. Moreover, the evidence, especially the transcript, was not extremely probative of any of the issues in the case. We cannot say the trial court erred in concluding the danger of unfair prejudice substantially outweighed the probative value. We note that the trial court's ruling did not prevent defendants from trying to introduce the subject matter of the excluded evidence in some other manner. In fact, defendants did use cross-examination to ask Kelly and other witnesses about the closed hearing.

■ The third ruling that is appealed here allowed Kelly to cross-examine Sutton regarding the following statement attributed to Sutton in a newspaper article:

If Pat Kelly wants to create a public forum to evaluate his professional fitness, the ISEA would be more than willing to oblige him.

That ruling was not erroneous. The statement could have been construed as inconsistent with Sutton's prior testimony that he had no opinion regarding Kelly's professional fitness. The possible inconsistency would be admissible for the general purpose of impeachment of credibility and, in this case, as evidence bearing upon the issue of actual malice.

The trial court's evidentiary rulings were not error. Nor was it error to submit this case to the jury. Defendants' cross-appeal must fail.

V. *New Trial.* The trial court set aside the jury verdict in favor of Kelly and ordered a new trial. Kelly appeals that order. We reverse and reinstate the jury verdict.

The trial court set aside the verdict because it found the award of damages to be excessive. Iowa Rule of Civil Procedure 244(d) allows a new trial to be granted when damages are excessive. The Iowa Supreme Court has cautioned, though, that:

a verdict will not be set aside or altered unless it is, (1) flagrantly excessive or inadequate; or (2) so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is the result

of passion, prejudice or other ulterior motive; or (4) is lacking in evidential support. *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 659 (Iowa 1969).

Generally, a trial court has broad discretion in passing on motions for new trials. *Houvenagle v. Wright,* 340 N.W.2d 783, 785 (Iowa Ct.App.1983). We are more reluctant to interfere with the granting of a new trial than with its refusal. *Vojak v. Jensen,* 161 N.W.2d at 106. However, an order granting a new trial will be set aside upon a clear showing of an abuse of discretion. *Id.* at 105–06. Such an abuse will be found when we can say there was no reasonable ground for the trial court to believe the jury reached an unjust result that may be obviated upon a second trial. *See Riley v. Wilson Concrete Co.,* 184 N.W.2d 689, 690 (Iowa 1971). The trial court found that the damages awarded by the jury were lacking in evidential support; were a result of passion, prejudice, or sympathy; and were so excessive that they shocked the judicial conscience. We do not believe the trial court was justified in concluding the damage award was lacking evidential support or the result of passion or prejudice. We also hold, as a matter of law, that the award was not so excessive that it shocks the judicial conscience. We therefore reverse the order for new trial.

Before explaining the reasoning leading to this holding, we first point out that only the appropriateness of the $75,000 compensatory award is at issue. The punitive damages award was supported by evidence of actual malice. *See Vinson v. Linn-Mar Community School District,* 360 N.W.2d at 117 (punitive damages not recoverable absent showing of actual malice). Additionally, the punitive award of $100,000 is reasonably proportional to the compensatory award of $75,000. *See McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362, 368 (Iowa 1972) ("amount of punitive damages must generally be proportionate to the actual damages"). Thus, the award of $100,000 punitive damages should not be set aside unless the $75,000 compensatory award is excessive.

In determining whether there was an evidentiary basis for the compensatory award, it must be remembered that the trial court ruled the defendants' writings were libelous per se. As such, they were "actionable in and of themselves *without proof of ... damage.*" *Vinson,* 360 N.W.2d at 115 (emphasis added). The trial court apparently overlooked this point when, in support of its order for new trial, it stated, "Aside from the statements themselves, this Court is hard pressed to find in this record any evidence that was presented that would be supportive of the position of the Plaintiff that he was exposed to public contempt, public ridicule and was deprived of public confidence or that he lost public esteem and lost social intercourse." Because the writings were libelous per se, Kelly did not have to present the kind of evidence the trial court found lacking.

That does not mean, however, that damages can be awarded based upon the writings alone and no other evidence. Recovery is for damages that are the natural and probable consequences of the libel. *Brown v. First National Bank of Mason City,* 193 N.W.2d at 555. The jury must therefore be presented with evidence upon which the consequences of the libel can be judged, evidence such as the nature of the plaintiff's reputation before the libel was published and the extent of the publication. *See, e.g., Melton v. Bow,* 241 Ga. 629, 631, 247 S.E.2d 100, 101 (1978). Kelly did present evidence that he had a good reputation as an administrator before defendant's writings were published. He presented evidence that the writings would adversely affect his reputation. He also submitted evidence of the extent of the publication. In addition, he presented evidence of special damages: emotional distress and lost speaking fees.

We conclude the evidence presented constituted an adequate basis for a substantial compensatory award. Although the evidence of special damages alone would not

support a very substantial verdict, we believe that the jury could conclude that the probable consequence of the libel would be substantial damage to Kelly's professional reputation. According to the evidence, Kelly did have a good reputation as an administrator. That reputation was endangered by libelous statements sent to people who were in the same profession as Kelly, and who were located in the same geographical region as Kelly. A jury could conclude, from the select nature of the recipients of the libel, that damage from the libel would be a more probable consequence in this case than in a case in which the recipients would not likely come into contact with Kelly.

The trial court's order for new trial observed that several of Kelly's own witnesses testified their personal opinion of Kelly had not been changed by defendants' writings. That observation is correct, but does not convey the whole essense of those witnesses' testimony. Some of those witnesses indicated they had become upset and had doubts about Kelly when they first read the libelous writings. The jury could conclude from their testimony that the reason their opinions of Kelly ultimately remained unchanged was that they were exposed to the truth through their personal acquaintanceship with Kelly. The jury could also conclude that people who were not acquainted with Kelly would not have any basis for disbelieving the libel.

The facts in this case are quite similar to those in *Foerster v. Ridder*, 57 N.Y.S.2d 668 (N.Y.Sup.Ct.1945). In *Foerster* the plaintiff, a college professor, had achieved eminence due to a distinguished career. *See id.* at 670. The libel, a charge of knowing and malicious falsification and deliberate distortion of facts, was circulated among fifty to sixty people who worked in the field of education, some at the same university as the plaintiff worked. *Id.* at 671–72. Even though no special damages were pleaded or proved, the trial court looked to presumed general damages in reducing the jury award to $50,000. *Id.* at 671, 670–74. Although the award was further reduced on appeal, it remained sub-

stantial. *See Foerster v. Ridder*, 275 A.D. 665, 87 N.Y.S.2d 419 (1949). In summary then, we find that the evidence presented was adequate to support a substantial damage award.

 We also find that the damage award was not the result of passion, prejudice, or other ulterior motive. The only reason offered for concluding the award was the result of such improper influence is that the award is so large. That reason is insufficient in this case. As the Iowa Supreme Court has indicated many times, passion and prejudice seldom arise as grounds for overturning a verdict when the verdict has support in the evidence. *See Olsen v. Drahos*, 229 N.W.2d 741, 742 (Iowa 1975). Because the evidence presented would support a substantial award, the large size of the verdict alone does not raise a presumption that the award was a result of improper influence. If the award is too large, it is because of the nature of this case, not because of passion or prejudice. The jury undoubtedly had problems making an award for such hard to quantify particulars as the "natural and proximate consequence of the publication [of the libel]," and the value of reputation.

We are now left to address the question whether the $75,000 compensatory award shocks the judicial conscience. We cannot say that it does. In so holding, we are confronted with the problem of valuing reputation. As everybody knows, there is no market price for reputation, no historical cost which can be depreciated, and no replacement cost to be calculated. The worth of reputation is a subjective matter, varying from person to person. One person's estimate of the value of reputation, moreover, may vary depending upon attendant circumstances. For example, the person may value reputation less if living in a large impersonal metropolis than the person would if living in a county seat in rural Iowa. This unquantifiable nature of the worth of reputation may be a sufficient reason to limit recovery in defamation actions to special damages. Such a limita-

tion, however, is not the law in Iowa. Nor are we presented with the issue of whether the law should be changed. Instead, we must determine whether the jury's evaluation of the damages incurred by Kelly shocks the judicial conscience.

■■■■ We believe the jury award was generous. Amply generous. The award may be at the limit of what can be sustained based upon the evidence. We do not believe, however, that $75,000 for compensatory damages is so excessive that it shocks the judicial conscience. In making this decision we consider our holding that the evidence supports a substantial award. We also consider that the award was entered by a jury of peers. The seven jurors who rendered the verdict have as much competence to evaluate damage to reputation as does a trial judge, or a panel of appellate judges. *Cf. Mazur v. Grantham*, 255 Iowa 1292, 1302, 125 N.W.2d 807, 813 (1964) (jury members with varied experiences are better able than judiciary to determine loss of consortium, which is not subject to exact calculation). Finally, we note that large damage awards are not unprecedented in libel cases, even though there is little or no proof of special damages. One example that we have found is mentioned in Laurence Eldredge's book on defamation, as follows:

> In *Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd.*, 50 T.L.R. 581, 99 A.L.R. 864 (C.A.1934), the English Court of Appeal sustained a verdict of £25,000 "for a lady who lives in Paris, and who has not lost, so far as we know," said Lord Justice Greer, "a single friend and who has not been able to show that her reputation has in any way suffered from the publication of this unfortunate picture play." 99 A.L.R. at 874. The plaintiff, Princess Irina Youssoupoff, claimed that the motion picture "Rasputin, the Mad Monk" portrayed her as having been seduced by Rasputin.

L. Eldredge, *The Law of Defamation*, § 2 n. 2 (1978). At the time of the decision, £ 5 was a good week's wages in England. *Id.*, § 23 n. 2.

Inflation and changing monetary exchange rates make it difficult for us to compare the award in *Youssoupoff* with Kelly's award. We believe, however, that the following recent cases show that the award of $75,000 compensatory damages in this case was not unprecedented, and does not shock the judicial conscience. *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 530–31, 540 (7th Cir.1982) *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983) ($100,000 compensatory award to attorney who was accused in a right-wing magazine of being part of a communist plot to discredit police); *Melton v. Bow*, 241 Ga. 629, 629–30, 247 S.E.2d 100, 101 (1978), *cert. denied,* 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (rejecting argument that $200,000 award was without evidentiary support because plaintiff's witness said Bow "has an outstanding reputation"); *McHale v. Lake Charles American Press*, 390 So.2d 556, 569 (La.Ct.App.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (compensatory award of $150,000 appropriate even though loss of income not proved).

We are not saying that juries have unlimited discretion to award damages in libel cases. At some point an award does become excessive. The jury in this case came close to reaching that point. However, in view of the circumstances in this case—especially the evidence of Kelly's good professional reputation, the composition of the recipients of the libelous statements, and the importance that reputation can have to the success of an administrator—the award was not excessive.

REVERSED AND REMANDED FOR REINSTATEMENT OF THE JURY VERDICT.