# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1110

_____

| | | |
|---|---|---|
| Michael Lynn, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Deaconess Medical Center-West | * | Eastern District of Missouri. |
| Campus, also known as Deaconess | * | |
| West Hospital, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: September 21, 1998

Filed: November 17, 1998

_____

Before RICHARD S. ARNOLD, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

BEAM, Circuit Judge.

Michael Lynn appeals from the district court's entry of summary judgment in favor of his former employer, Deaconess Medical Center-West Campus (Deaconess). Lynn alleges that Deaconess terminated him on the basis of his gender in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 and the Missouri Human Rights Act (MHRA), Mo. Ann. Stat. §§ 213.010-213.137. For the reasons discussed below, we reverse and remand for further proceedings.

## I.    BACKGROUND

Viewed in the light most favorable to Lynn, the record reveals the following facts.  Lynn began working for Deaconess as a registered nurse in the Acute Rehabilitation Unit (Rehab Unit) on March 19, 1992.  He initially held the position of charge nurse, and performed supervisory duties such as quality assurance, patient care, evaluation, and scheduling staff nurses and patient care technicians.  His supervisor at this time was Cyndi Murphy.  In March 1993, Jackie McClanahan replaced Murphy as director of the Rehab Unit.  During this time period, no performance deficiencies were noted nor were any disciplinary actions taken against Lynn.

In April 1994, Patricia Shanks replaced McClanahan as director of the Rehab Unit.  The hospital was also interviewing applicants for the position of Assistant Patient Care Manager in that unit.  Lynn interviewed with Shanks for the position but he was rejected.  Lynn had both a bachelor's and a master's degree in nursing and had been working for over two years as a charge nurse in the Rehab Unit.  Instead, Shanks hired Janene Ford. Ford had only an associate nursing degree, no postgraduate nursing education, and had only been employed with Deaconess for four months as a staff nurse.  After Ford assumed her position, Lynn  reported directly to Ford instead of to Shanks.  Shortly thereafter, Shanks decided that because the Rehab Unit was so small there was no need to employ both an Assistant Patient Care Manager and a charge nurse.  She then demoted Lynn from charge nurse to staff nurse on July 17, 1994.

According to the record, complaints regarding Lynn's work performance began while he was still reporting to Shanks.  On June 3, 1994, Shanks received a report that Lynn had lain on a couch and watched television during his shift.  After confirming the report with another worker, Shanks verbally counseled Lynn.  Lynn explained to Shanks that he was resting because he had not been feeling well.  Shortly before Ford assumed her new position, Shanks told her about a family member's complaint that

Lynn had not taken care of a patient after the patient had urinated in bed. Ford investigated the incident and concluded that there had been no wrongdoing by Lynn.

The record shows that in November and December of 1994, Lynn received verbal counseling from Ford on various issues such as allegedly arriving late to work, failing to comply with time-clocking policies, exhibiting a lack of productivity, and complaints about his lack of compassion towards staff and patients. Finding that Lynn's performance was not improving, Ford and Shanks issued two Letters of Understanding to Lynn on January 13, 1995.[1] The first Letter of Understanding (Letter) stated that Lynn had been late for work by about five minutes on different occasions and that he failed to have his timecard signed when he clocked in late. The second Letter addressed three areas of concern: (1) incomplete documentation; (2) an attitude of disrespect and lack of compassion towards others; and (3) an ongoing failure to meet productivity standards. Lynn responded to these Letters with a written statement which explained that his time clocking and documentation procedures had been the result of confusion with earlier policies and not the result of willful neglect. Lynn denied the other charges.

According to his supervisors, Lynn showed improvement after he received these Letters, but after January 30, 1995, he again began to exhibit performance problems. On February 20, 1995, Lynn was issued a third Letter for allegedly diagnosing a patient.[2] However, Ford's annual evaluation of Lynn's work performance in April 1995,

---

[1] Deaconess has a long-standing policy of progressive discipline. When a problem first occurs, an employee receives verbal counseling. If the problem continues, the employee receives written counseling called a "Letter of Understanding." If the problem persists, a further Letter of Understanding or a Recommendation of Discharge is issued.

[2] Deaconess's policy was that only physicians were to diagnose patients.

described Lynn as "frequently exceed[ing] standards" in four of the twenty-four categories and as "meeting standards" in the other twenty categories.

Finally, two incidents occurred which resulted in Lynn's eventual discharge. On August 1, 1995, Lynn reportedly failed to assist a family member in attaching certain therapeutic equipment to her mother. On August 2, he allegedly failed to correctly prepare essential documents for a Patient Conference Team Meeting. On August 7, 1995, Ford and Shanks issued Lynn a Recommendation for Discharge on the ground that Lynn's work performance thus far reflected "a serious lack of appropriate nursing judgment" and they gave him the option of resigning. Lynn chose to resign on August 7, 1995.

Lynn then initiated the present action, alleging that Deaconess had discriminated against him on the basis of his gender in violation of Title VII and the MHRA. The district court entered summary judgment in favor of Deaconess, and Lynn now appeals.

## II.    DISCUSSION

We review a grant of summary judgment de novo, using the same standards as applied by the district court. See Hill v. St. Louis Univ., 123 F.3d 1114, 1118 (8th Cir. 1997). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).   The moving party bears the burden of showing the absence of a genuine issue of material fact. See Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998). In reviewing employment discrimination claims, we keep in mind the caution that summary judgment should seldom be used in discrimination cases. See Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). Because such cases often depend on inferences rather than on direct evidence, summary judgment should not be

granted unless the evidence could not support any reasonable inference for the nonmovant. See id.

Title VII and the MHRA declare it unlawful for an employer to discharge "or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); see also Mo. Ann. Stat. § 213.055(1)(1)(a). Because Lynn has not put forth direct evidence of discrimination, his Title VII and MHRA claims are analyzed under the three-stage burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and applied in countless other cases.[3] See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993); Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1332 (8th Cir. 1996).

Under this framework, Lynn bears the initial burden of establishing a prima facie case of discrimination. See Rothmeier, 85 F.3d at 1332. Once a prima facie case is established, a rebuttable presumption of discrimination arises and the burden of production shifts to Deaconess to articulate a legitimate, nondiscriminatory reason for discharging him. See id. If Deaconess produces such a reason, the presumption disappears and Lynn bears the burden of proving that the proffered reason is merely a pretext for discrimination. See id. Lynn retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination. See id.

Deaconess concedes that the first two stages of the McDonnell-Douglas framework have been met, i.e., that Lynn has established a prima facie case of discrimination and that Deaconess has sufficiently articulated a nondiscriminatory

---

[3]The McDonnell-Douglas analysis also applies to claims under the MHRA. See Hossaini v. Western Missouri Med. Ctr., 97 F.3d 1085, 1088 (8th Cir. 1996).

reason for discharging him.  It argues, however, that  Lynn has not produced sufficient evidence to meet his burden of establishing pretext.

We disagree.  As proof of pretext, Lynn presented evidence that Deaconess disciplined female nurses in the Rehab Unit less severely than he was disciplined for conduct that was more egregious than his.  Primarily, Lynn points to his supervisors' favorable treatment of another registered nurse in the Rehab Unit, Karen Mohr.[4] Instances of disparate treatment can support a claim of pretext, but Lynn has the burden of proving that he and the disparately treated female nurses were "similarly situated in all relevant respects."  Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (quotations omitted).

The record shows that beginning on  February 3, 1995, Ford started receiving reports that Karen Mohr slept while on duty.  Gail Washington, a patient care technician, reported to Ford that on one shift she had seen Mohr go into an empty patient's room, and take three 45-minute naps with the television on.  Another patient care technician, Angie Washington, reported to Ford that during these naps Mohr would be sound asleep and difficult to arouse.  It was only after Ford had received four reports of Mohr's sleeping that Ford finally talked to Mohr on May 24, 1995.  For a few months following that counseling, Mohr performed adequately, but reports of her sleeping on the job began to surface again in November of that same year.  It was not until Ford had received at least five reports in November and December about Mohr's sleeping on duty that Ford and Shanks issued her a Letter of Understanding on December 6, 1995.

---

[4]Lynn also points to Deaconess's favorable treatment of other female nurses despite their various forms of misconduct. Because we find that the facts regarding Karen Mohr constitute sufficient evidence to allow Lynn to prevail on the issue of pretext, we accordingly limit our discussion of the facts to her case.

The district court found that Lynn and Mohr were not similarly situated for purposes of proving pretext because: (1) Unlike Mohr, Lynn was not disciplined for the offense of sleeping; and (2) Lynn and Mohr had different disciplinary histories.

We think that the district court applied the "similarly situated" concept too narrowly when it stated that because Lynn had not engaged in the offense of sleeping, Deaconess's treatment of Mohr was not relevant to the issue of whether Lynn had been discriminated against. To show that employees are similarly situated, a plaintiff need only establish that he or she was treated differently than other employees whose violations were of "comparable seriousness." See Ricks v. Riverwood Int'l Corp., 38 F.3d 1016, 1019 (8th Cir. 1994); see also McAlester v. United Airlines, Inc., 851 F.2d 1249, 1261 (10th Cir. 1988) (stating that in a disparate treatment case the fact that other employees did not commit the exact same offense as the plaintiff does not prohibit consideration of their testimony as long as their acts were of comparable seriousness).[5] To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove

_____

[5]The district court and Deaconess rely on Ward v. Procter & Gamble Paper Prods. Co., 111 F.3d 558 (8th Cir. 1997), as stating the standard that employees are similarly situated only when they engage in the *same* offense. In Ward, the court stated that instances of disparate treatment can support a claim of pretext if the plaintiff can prove that she and the other employees are "similarly situated in all relevant respects." Id. at 560. It went on to acknowledge that employees are similarly situated when they are "involved in or accused of the same offense." Id. The court then rejected the plaintiff's argument that she and another employee who were involved in a fight were engaged in the same offense because it found that the fight involved two separate levels of escalation. See id. at 561. There is no language in Ward which suggests that employees are "similarly situated" *only* when they engage in the same offense. If anything, the reasoning of the Ward opinion supports our view that the inquiry into whether employees are similarly situated requires looking beyond the labels attached to the employees' misconduct.

discrimination. Common sense as well as our case law dictate that we reject such an approach. We think that Mohr's sleeping on the job was at least comparable to, if not much more serious than, the misconduct alleged against Lynn. Under the circumstances, we find that Lynn and Mohr were similarly situated.

The district court also incorrectly concluded that Mohr and Lynn were not similarly situated because Lynn had an extensive record of disciplinary problems and received three Letters while Mohr had had only one Letter issued to her. We think Lynn has produced sufficient evidence to at least create a factual dispute as to whether the differences in Mohr's disciplinary history and his were due to gender discrimination. The record shows that Lynn had no reports of work performance deficiencies in the time period prior to when Shanks and Ford became his supervisors. Lynn received his third Letter without any prior verbal counseling or discussion about what had happened. Following Lynn's receipt of these Letters of Understanding, there is no written documentation that these deficiencies recurred. In fact, in her annual evaluation of Lynn in April 1995, Ford noted improvement in some of the very areas for which Lynn had been reprimanded in the Letters. In her testimony, Ford claims that just because she did not document any serious deficiencies in Lynn's performance from the time of the April evaluation to his discharge in August does not mean that they did not occur. We find this explanation disingenuous, especially since the record shows that Ford documented numerous incidents prior to this period and continued after the April evaluation to document minor incidents such as Lynn not wearing a lab coat.

The record also shows that although Ford and Shanks were quick to verbally counsel Lynn and to issue him Letters of Understanding, it took numerous reports and several months before Mohr was verbally counseled about her sleeping problem. It took more than eleven months of repeated reports of sleeping on the job before Mohr was issued a single Letter of Understanding. Sleeping on the job appears to us to be particularly egregious misconduct for a nurse on duty. The gravity of Mohr's infraction is further exacerbated by the fact that sometimes Mohr would be the only nurse present.

In fact, one of the physicians on staff expressed his concern that if a nurse slept she might not be able to hear a Code Blue called over the intercom.  Certainly Mohr's actions seem at the least to constitute the same kind of "serious lack of appropriate nursing judgment" that resulted in Lynn's discharge.[6]  Thus, we find sufficient evidence to create a genuine fact issue as to whether the reason proffered by Deaconess was pretext.

Nevertheless, evidence of pretext, standing alone, does not invariably preclude summary judgment.  See Ryther v. KARE 11, 108 F.3d 832, 838 n.5 (8th Cir. 1997) (en banc), cert. denied, 117 S. Ct. 2510 (1997).  The legal standard to be applied is set out in Maschka v. Genuine Parts Co., 122 F.3d  566, 571 (8th Cir. 1997):

> We recently considered the precise contours of [the legal standard to be applied] in our en banc decision, Ryther v. KARE 11, 108 F.3d 832 (8th Cir.), cert. denied, ___U.S.___, 117 S. Ct. 2510, 138 L. Ed.2d 1013 (1997).  The holding of that case may be summarized as follows:  if a prima facie case is made, and if the plaintiff offers evidence tending to show that the defendant's proffered reasons for its decision were not the real reason, then the jury may decide the case, unless the "evidence of pretext . . . is, standing alone, inconsistent with a reasonable inference of age discrimination."  Id. at 837; see also Johnson v. Baptist Med. Ctr., 114 F.3d 789, 789 (8th Cir. 1997) ("We held [in Ryther] that the plaintiff's evidence must tend to make out a prima facie case and support a finding that the defendant's proffered reasons for the decision complained of were pretextual."), amending on denial of suggestion for rehearing en banc 97 F.3d 1070 (8th Cir. 1996).

Lynn has met these requirements by establishing a prima facie case and offering evidence from which a jury could conclude that the reasons offered by the employer for

---

[6]Also, on August 2, 1995, the same family member that had complained about Lynn a day earlier, lodged a similar complaint against Mohr.

discharging him were pretextual. Furthermore, the evidence Lynn presented was not inconsistent with the finding of age discrimination; rather, it tended to show that Deaconess's proffered reasons were flimsy, and thus susceptible of disbelief. Once a gender-discrimination plaintiff has done as much as Lynn, a jury may (but need not) find for him. See Hicks, 509 U.S. at 511 ("[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . '[n]o additional proof of discrimination is *required*.'" (footnote and citation omitted)).

Thus, we conclude that Lynn presented evidence sufficient to create a reasonable inference that Deaconess's proffered reasons for discharging him were mere pretext for intentional discrimination. Under the McDonnell-Douglas framework, this is enough to survive a motion for summary judgment. Although Deaconess may ultimately be able to offer a plausible explanation for its treatment of Lynn and its other nurses, these are matters to be decided at trial and not by summary judgment.

## III.   CONCLUSION

The judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-