**Mara C. SMITH, Plaintiff,**

v.

**IOWA JEWISH SENIOR LIFE CENTER, Defendant.**

No. 4–99–CV–90294.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 17, 2001.

George F. Davison, Jr., Carla T. Schemmel, Glenn L. Norris, Lex Hawkins, Hawkins & Norris, Des Moines, IA, for plaintiff.

Frank A. Comito, Kent A. Gummert, Gaudineer & Comito, LLP, West Des Moines, IA, David Harris Goldman, Babich Goldman Cashatt & Renzo, Des Moines, IA, for defendant

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

The Court has before it Defendant's Motion for Summary Judgment. In her Petition,[1] Plaintiff alleges what appears to be four counts: (1) discriminatory discharge in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and the Iowa Civil Rights Act (ICRA); (2) retaliation in violation of Title VII and the ICRA; (3) intentional infliction of emotional distress; and (4) defamation. Defendant requests summary judgment on all counts. Plaintiff conceded summary judgment on her intentional infliction of emotional distress claim at the hearing on this matter. For the reasons that follow, the Court denies Defendant's motion with respect to every count except intentional infliction of emotional distress.

## I. BACKGROUND

This lawsuit arises out of the termination of Plaintiff, Mara Smith, by Defendant, Iowa Jewish Senior Life Center (the Center). Smith began her employment at the Center on February 22, 1987 as a Certified Nursing Assistant (CNA), which entailed providing daily physical care to residents. Smith later received certification as a Restorative Nursing Assistant (RNA). Smith's primary function as a RNA was to perform assigned physical therapy tasks for the residents, such as ambulation, range of motion exercises, hot packs, transfers, traction, and message. As a RNA, or physical therapy assistant, Smith was directly responsible to the physical therapist and also reported to the Director of Nursing, Barbara Dacre (Dacre), who in turn reported to the Center's Executive Director, Stephen Blend (Blend).

The Center terminated Smith on January 19, 1996. The cause of her termination is at the heart of the dispute here. The Center's version of what happened is as follows. In the Fall of 1995, Blend became concerned about the rather rapid decline exhibited by one of his favorite residents. He then asked Dacre to determine the cause of the decline. After being unable to find any medical cause to explain the decline, Dacre's focus turned to whether the residents were being provided with the scheduled rehabilitative therapy. Blend and others were concerned that Smith was spending an inordinate amount of time chatting with other employees, using the telephone for personal calls, and generally not appearing to be very busy. Because of these concerns, Blend asked Dacre to determine whether Smith was performing the required rehabilitative therapies. Dacre, in response to that request, asked one of the Center's nurses, Lori Ann Haight (Haight), to monitor Smith's activities over the course of an eight-hour shift. The Center claims that the monitoring, conducted on January 17, revealed that Smith falsified the treatment records of at least 16 residents to reflect that she had performed the assigned therapy when she, in fact, had not. This, it argues, was the reason it terminated Smith.

Smith explains her termination differently. She begins by explaining that she was in fact a good worker. She states that during the ten years she worked for the Center she only received two written warnings. The first warning was on August 1, 1987, for being verbally aggressive and arguing with a nurse. The second warning was on June 13, 1993, for "inability to follow supervisory requests" to limit her phone usage. Smith states that she

---

**1.** Plaintiff filed this action in the Iowa District Court for Polk County and Defendant removed to the Federal District Court for the Southern District of Iowa.

was never informed, either verbally or in writing, that she was not performing her duties with her patients in the proper manner or that there were concerns that she was not fully or adequately exercising her patients. Smith then goes on to explain that she had made several complaints to Blend about Dacre treating female employees differently than male employees. Smith states that Blend did not investigate these claims, contrary to office policy, and that her workload increased and she was forced to work holidays as a result of her complaints. Smith also explains that she knew she was being monitored on the day in question[2] and that she never did anything wrong. She states that rather than doing treatments on all her patients individually, she did some of her treatments in group sessions as directed by the physical therapist. Finally, Smith explains that she was the only employee who was ever monitored and that another employee, a CNA named Mike Huffman (Huffman), was not terminated after conduct that was similar to the conduct the Center alleges of Smith. All this, Smith argues, shows that discrimination and retaliation were the true reasons for the Center's termination of her.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines

---

**2.** In her statement of facts, Smith states that the day she was monitored was January 16, 1996. Pl.'s Statement of Facts Filed in Resist. to Def.'s Mot. for Summ. J. at 30. Yet Smith also admits in the same document that January 17, 1996 was the day she was monitored. *Id.* at 10. However, after a review of the record, the Court believes that parties are talking about the same day.

whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.* However, the Eighth Circuit "has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based.... Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998) (citations omitted).

### III. DISCUSSION

In her Petition, Smith actually only alleges three counts: employment discrimination; intentional infliction of emotional distress; and defamation. However, in her employment discrimination count Smith alleges that she was subject to both a discriminatory discharge and retaliation. Her submissions in response to the Center's Motion for Summary Judgment do not distinguish between the two claims, but they support both. When asked at the hearing on this matter whether it is her intention to make two separate claims, Smith responded that she was not sure. The Court will therefore treat Smith as alleging both a discriminatory discharge claim and a retaliation claim. Also, as mentioned, Smith has withdrawn her claim of intentional infliction of emotional distress. In sum, Smith alleges three claims, discriminatory discharge, retaliation, and defamation—all of which are at issue with respect to the Center's Motion for Summary Judgment.

### A. Discriminatory Discharge

■ Title VII and the ICRA make it unlawful for an employer to discharge an individual because of his or her sex. 42 U.S.C. § 2000e–2(a)(1); Iowa Code § 216.6(1)(a).[3] Where, such as here, the plaintiff does not put forth any direct evidence of discrimination, her Title VII and ICRA claims are analyzed under the three-stage burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Lynn v. Deaconess Medical Center–West Campus,* 160 F.3d 484, 487 (8th Cir.1998). Under this framework, the plaintiff bears the burden of first establishing a prima facie case. *Id.* If the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer satisfies this burden, the presumption of discrimination disappears and the plaintiff must then show that the employer's proffered reason was merely pretext for discrimination. *Id.* Under this framework, one way to show that the employer's legitimate, nondiscriminatory reason is merely pretext for discrimination is by demonstrating that another employee, not in plaintiff's protected class, received more favorable treatment after misconduct that was of "comparable seriousness." *See Phillips v. Union Pacific Railroad Co.,* 216 F.3d 703, 706 (8th Cir. 2000). Another way to establish pretext is to simply show that the employer's proffered reason is false; however, this must be done in such a way as to not only show that the employer's reason for terminating the plaintiff was not the real reason but that discrimination was the real reason. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

---

**3.** Iowa courts follow Title VII analysis in their interpretation of the ICRA. *See Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 893 (Iowa 1990) (stating that, in the past, the Iowa Supreme Court has applied federal principles and analytic framework to cases under Iowa Code Ch. 216).

Some courts, on the other hand, have condensed this burden-shifting framework in cases involving disparate treatment under work rules. Those courts have stated that a plaintiff can make out a prima facie case by showing that they are a member of a protected class, that they were disciplined, and that the discipline imposed was more severe than that imposed on a comparably situated person who is not a member of the plaintiff's protected class. *See Wilmington v. J.I. Case Co.*, 793 F.2d 909, 915 (8th Cir.1986); *EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340–41 (10th Cir. 1982). The Court finds both approaches relevant to this case.

■ Smith compares her conduct to that of Huffman. Huffman's personnel file shows that he received the following written Employee Warning Report prepared by Dacre for an incident that occurred on March 5, 1996:

> During rounds with Medical Director I found [resident name omitted] incontinent of stool and urine, hair uncombed, improperly positioned, and with food still on overbid table at 3:15 pm. [Resident] stated, "Mike was suppose to take care of me today but the only thing he did was bring me my lunch tray." Lori Ann Gaight, RN was his supervising nurse and did ADL's [assisted daily living activities] for [him] before shift ended. Lori Ann had instructed Mike to keep [resident] in bed due to a problem [resident] was having with back pain and to do her cares in bed. Mike left early failing to do any ADL's and or report to supervising RN. I will request that Mike have each resident checked by his supervising RN before he gets them up for the day and after completing cares until further notice, and any other incidence of substandard care will result in termination.

Smith argues this warning shows that Huffman failed to perform his duties, or at least failed to record what he had done, and yet was not terminated.

The Center argues that Smith's situation was not similar to Huffman's situation. First, the Center argues that CNA's are different than RNA's in terms of their level of responsibility. It states that CNA's are supervised by a nurse and have alternating shifts, so that if a CNA does not assist a resident with their daily living needs as assigned, either the supervising nurse will take care of it or the CNA on the next shift will take care of it. In contrast, the Center states there are no other shifts of RNA's, and that if an RNA fails to perform her duties no one else would either do them or know that they were not done. Second, it argues that the proofs in the two situations are different. It states that in Smith's situation her activities were monitored for an entire day by a veteran nurse, whereas in Huffman's situation the allegations were reported by a resident with dementia problems. The Court has to agree with the Center, that based solely on the comparison with the treatment of Huffman, Smith does not establish a genuine issue as to pretext. *See Phillips v. Union Pacific Railroad Co.*, 216 F.3d 703, 706 (8th Cir.2000) (finding seriousness of conduct not comparable where plaintiff threatened to kill two co-workers and other employee just had a disruptive temper and often used profanity); *Ward v. Procter & Gamble Paper Prod. Co.*, 111 F.3d 558, 560–61 (8th Cir. 1997) (finding seriousness of conduct not comparable where plaintiff slapped co-worker's back and other employee just grabbed co-worker's finger).

■ Smith, however, also disputes whether she even falsified her report. Haight's report allegedly shows that Smith did not perform all of her duties and yet indicated that she did on her report. Smith argues that Haight's report leaves

out group therapy and only includes the times Smith was in the resident's rooms. She argues that it was impossible for her to complete all of her assigned physical therapy duties on an individual basis and that group therapy was intended. In addition, Smith states that she had been doing her treatments in group sessions for a long time and that Dacre knew about it. This last piece of information, Smith contends, is relevant because although Dacre did not have the authority to terminate her, she was involved in advising Blend on the monitoring process. And relevant to Smith's relationship with Dacre, is the fact that Smith made several complaints to Blend asserting that Dacre treated male employees differently than female employees and that Dacre was jealous of her contact with another employee.

Based on this evidence, the Court finds that Smith has created a genuine issue of material fact as to whether she was terminated because of her sex. As the Court stated, Smith's comparison of her treatment with that of Huffman, standing alone, is not enough. However, the comparison is enough when supported by evidence that Smith may have actually performed her duties, or at least arguably performed them, and that the Center may have known that. This evidence mitigates the seriousness of Smith's conduct and thus makes it comparable to Huffman's conduct. In sum, Smith has generated a jury question as to whether her conduct on January 17, 1996 was the true reason for her termination.

### B. Retaliation

Title VII and the ICRA also make it unlawful for an employer to retaliate against an employee who opposes discrimination. 42 U.S.C. § 2000e–3(a); Iowa Code § 216.11(2). The process of proof in a retaliation case follows the same *McDonnell Douglas* burden-shifting framework as outlined above. *See Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir.1998). However, the prima facie case for a retaliation claim consists of the following evidence: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity." *Id.*

Smith has generated a jury question as to whether she has made out a prima facie case. Smith engaged in protected activity when she complained to Blend about Dacre treating the male employees better than the female employees. These complaints count as protected activity even if Dacre did not actually treat the male employees better—just so long as Smith held a reasonable belief she did. *See Evans v. Kansas City, Missouri School Dist.*, 65 F.3d 98, 100 (8th Cir.1995) ("To demonstrate the presence of protected opposition, a plaintiff must show a good faith reasonable belief that his employer engaged in a discriminatory employment practice."). And the record supports a finding that Smith honestly believed that she was being discriminated against. Also, it is undisputed that the Center terminated Smith. Finally, Smith has proffered a few pieces of evidence that go to causation. First, Blend never investigated any of Smith's complaints, even though not to do so was against the Center's policy. Second, Smith contends that she was given more work and forced to work holidays after complaining. Third, one of Smith's co-workers overheard Dacre and the assistant administrator say that they wished they could get rid of Smith. Fourth, and related to the question of pretext, Smith offers proof that the Center concocted a reason to terminate her.

Smith has also generated a jury question as to pretext. The Center's legitimate, nondiscriminatory reason for termi-

nating Smith continues to be that she failed to perform her duties and falsified her report to indicate that she had performed them. And as described above, Smith has submitted proof that Huffman was treated differently than she was for not performing his duties and proof that she might have actually performed her duties, and performed them in a manner in which the Center already knew about. This evidence could reasonably lead to a conclusion that the Center merely used the monitoring conducted on January 17 as a pretext for getting rid of her because of her complaints about Dacre. Summary judgment on her retaliation claim would therefore be inappropriate.

## C. Defamation

█ Finally, Smith claims that the Center defamed her in a telephone conversation between the husband of her current employer, Sheldon Rabinowitz, and an attorney for the Center, David Goldman. Smith alleges that Rabinowitz called Goldman and that when Rabinowitz asked about a claim against the Center, Goldman responded something to the effect that Smith was suing the center for sex discrimination but that it was the Center's position that Smith was terminated for falsifying records. As an initial matter, the Center contends that Goldman's statement was literally true and that Goldman could not harbor any malice against Smith because he did not even know Smith. The Court notes that the implication of Goldman's statement is a question for the jury, that the statement will be attributed to the Center since Goldman was acting in his capacity as an attorney for the Center at the time, and that the question will therefore be whether the Center harbored the requisite malice.

█ Smith alleges that Goldman's statement constitutes slander per se. " 'An attack on the integrity and moral character of a party is [slanderous] per se.' " *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (alteration in original) (quoting *Vinson v. Linn–Mar Community School District*, 360 N.W.2d 108, 116 (Iowa 1984)).[4] As such, statements that are slanderous per se are actionable without proof of malice, proof, or special harm. *Lara*, 512 N.W.2d at 785. In *Vinson*, 360 N.W.2d at 116, the court held that "a statement that an employee was fired for making incorrect entries on her time card could reasonably be taken as imputing dishonesty to the employee" and therefore understood as slander per se. The Court will thus regard Goldman's alleged statement as slanderous per se.

█ The Center argues, that in any event, the statement is protected by either the judicial proceeding privilege or the qualified privilege. Goldman's statement is not protected by the judicial proceeding privilege. The parameters of the judicial proceeding privilege are as follows:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

*Kennedy v. Zimmermann*, 601 N.W.2d 61, 64 (Iowa 1999) (quoting Restatement (Second) of Torts § 586 (1977)). In *Kennedy*, the court held that "statements made by an attorney to a newspaper reporter in the course of an interview conducted by the newspaper reporter, essentially restating

---

**4.** The Court will apply Iowa law since the alleged statement occurred in Iowa. *See Smith v. Des Moines Public Schools*, 259 F.3d 942, 948 (8th Cir.2001) (applying Iowa law to a defamation claim where the statements where made in Iowa).

the allegations of a petition filed with the court," did not fall within the privilege. *Id.* at 65. It stated that "republication outside a judicial proceeding of protected communications previously made in a judicial proceeding is not privileged." *Id.* at 66.

The facts in *Kennedy* are very similar to the facts here. Rabinowitz was not an attorney and did not have permission to call on Smith's behalf. Therefore, the Court finds that Goldman's statement is not protected by the judicial proceeding privilege.

 There is a genuine issue of material fact, however, as to whether Goldman's statement is protected by the qualified privilege. The parameters of the qualified privilege are as follows:

[A] qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which that person has a right or duty, if made to a person having a corresponding interest or duty in a manner and under circumstances fairly warranted by the occasion.

*Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994). A person's past employer and current employer have a corresponding interest in whether that person is a good employee. *See Lara*, 512 N.W.2d 777, 786 (applying the qualified privilege to statement made by past employer to current employer); *Vinson*, 360 N.W.2d 108, 114, 116–17 (applying the qualified privilege to statement made by past employer to prospective employer). The privilege therefore applies to Goldman's statement. However, the qualified privilege does not protect a statement that is made with actual malice. *See Vinson*, 360 N.W.2d at 116. "[A]ctual malice 'requires proof that the statement was made with ill will, hatred, the desire to do another harm, or wrongful motive.'" *Smith v. Des Moines Public Schools*, 259 F.3d 942, 948 (8th Cir.2001) (quoting *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 546 (Iowa 1995)). As described above, a jury could find that the Center had a wrongful motive—namely, discrimination. That motive would then vitiate the privilege. Accordingly, the Court will not grant summary judgment on Smith's defamation claim.

Smith also claims that the Center defamed her by telling her co-employees that she had falsified her report. Two of Smith's former co-workers testified in their depositions that nurses or other personnel told them that Smith was terminated for falsifying records or something to that effect. Inter-office defamation is a complicated issue. The Iowa Supreme Court has yet to decide whether inter-office communications are published for purposes of a defamation claim. *See Taggart v. Drake University*, 549 N.W.2d 796, 802–03 (Iowa 1996). The issue may also turn on whether the employees involved were supervisory personnel. *Id.* at 803. But the Court need not decide this issue, as Smith has already established a genuine issue of material fact as to her defamation claim.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment (Clerk's No. 36) is granted with respect to Plaintiff's intentional infliction of emotional distress claim and denied with respect to Plaintiff's employment discrimination and defamation claims.

IT IS SO ORDERED.